# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA

      Plaintiff,

vs.                                               No. CR 13-2603 JB

CARLOS GONZALEZ RIVAS,

      Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on: (i) the Defendant's Motion for Discovery, filed November 14, 2013 (Doc. 24)("Motion for Discovery"); and (ii) the Defendant's Motion for Disclosure of Identity of and Information About Confidential Informant, filed November 14, 2013 (Doc. 25)("Motion for Disclosure"). The Court held a hearing on January 8, 2014. The primary issues are: (i) whether Plaintiff United States of America must disclose the identity and other discovery regarding the Confidential Informant ("CI"); and (ii) whether the United States must provide discovery related to the drug transactions for which Defendant Carlos Gonzalez Rivas[1] was not indicted. The Court will grant in part and deny in part the Motion for Discovery, and will deny the Motion for Disclosure. The Court will not require the United States to disclose the CI's identity, because the CI was not present for the drug transactions with which Rivas was indicted and which make up the relevant conduct for his sentence. Further, Rivas asserts that he believes he knows the CI's identity, and the Court concludes that unnecessarily requiring the United States to disclose the CI's identity jeopardizes the CI's safety. The Court will not require

---

[1] Rivas' counsel, Mr. Marc Robert, refers to Rivas as "Mr. Gonzalez," but when the Honorable Karen B. Molzen, Chief United States Magistrate Judge, asked at the plea hearing which name Rivas preferred, he said Rivas. The Court will thus use Rivas throughout the opinion, except when quoting Mr. Robert.

the United States to provide discovery related to the drug transactions for which Rivas was not indicted and which do not make up relevant conduct for purposes of the Presentence Investigation Report, disclosed February 7, 2014 ("PSR"), but will require the United States to provide discovery related to the drug transactions that are included as relevant conduct in the PSR.

**FACTUAL BACKGROUND**

The Court takes the facts from the PSR, which was "derived from discovery material contained in the United States Attorney's file as reported by the Drug Enforcement Administration (DEA)." PSR ¶ 5, at 3. On May 14, 2013, an undercover DEA Special Agent met Rivas in the parking lot of the Big-5 Sporting Center in Los Lunas, New Mexico. See PSR ¶ 6, at 3. The first transaction occurred at approximately 11:47 a.m.; the agent paid Rivas $1,300.00 in exchange for the suspected methamphetamine. See PSR ¶¶ 7-8, at 3. The agent told Rivas that he had enough money for two additional ounces and requested that Rivas contact his source of supply for an additional ounce. See PSR ¶ 9, at 3. The agent saw Rivas make a telephone call, and Rivas told the agent that it would be an hour and a half before he could return with the additional methamphetamine. See PSR ¶ 9, at 3-4. The two agreed to meet later that day. See PSR ¶ 9, at 3-4. At approximately 12:12 p.m., Rivas contacted the agent and told him that he had an additional ounce of methamphetamine for $1,250.00. See PSR ¶ 10, at 4. The two met again at the Big 5 parking lot, and the agent purchased the suspected methamphetamine. See PSR ¶ 10, at 4. The agent purchased 59.3 total grams of suspected methamphetamine from the two May 14, 2013, transactions, and a laboratory report indicated that there were 53.2 net grams of methamphetamine (actual) from the transactions. See PSR ¶ 6, at 3; id. ¶ 10, at 4.

On July 15, 2013, the agent arranged to purchase additional methamphetamine from Rivas.  See PSR ¶ 11, at 4.  Rivas told the agent that he would meet Jackie L/N/U in the Big 5 Sporting Store parking lot in Los Lunas.  See PSR ¶ 11, at 4. The agent purchased approximately 85.2 grams of suspected methamphetamine from Jackie L/N/U for $3,600.00, and a laboratory report indicated that there was 81.9 net grams of methamphetamine (actual).  See PSR ¶¶ 11-13, at 4.

The PSR includes two other drug transactions in the section entitled "Offense Behavior Not Part of Relevant Conduct," based on information from the United States' Response in Opposition to Defendant's Motion for Discovery (Doc. 24) and Motion for Disclosure of Identity of and Information About Confidential Informant (Doc. 25), filed December 2, 2013 (Doc. 32)("Response").  PSR at 6.  On February 27, 2013, "a confidential source working in an undercover capacity of the DEA[] made a controlled purchase of 13.6 grams of methamphetamine actual" from Rivas, but the United States "did not charge the defendant in order to protect the identity of the confidential source.  Investigative reports and laboratory reports were not disclosed for the transaction."  PSR ¶ 30, at 6.  On April 30, 2013, "a CS and a DEA agent, both working in an undercover capacity at the direction of the DEA made a controlled purchase of 28 net grams of cocaine from the defendant."  PSR ¶ 31, at 7.  The United States "did not charge the defendant for the 28 net grams of cocaine specifically to avoid having the CS testify should the matter proceed to trial in order to protect the life of the CS."  PSR ¶ 31, at 7.  The United States did not include the cocaine for sentencing purposes "in order to protect the confidential source," and said that "there was no discovery provided regarding this transaction."  PSR ¶ 31, at 7.

Rivas, through counsel, provided his version of the events in the PSR:

I was not in the business of selling methamphetamine.  A person who was apparently cooperation [sic] with the government asked me repeatedly to sell some methamphetamine.  I repeatedly refused.  I even changed my phone number to avoid the repeated requests by this person to commit this crime.  Finally, though, after losing the job I had had, I agreed to do as he asked, and he introduced me to the undercover officer.  I had to find someone to provide the methamphetamine the undercover officer wanted.  I delivered the methamphetamine to the undercover officer, who paid me for the methamphetamine. I took the money to the source of the methamphetamine, who paid me $200 for making that transaction.  There were two transactions on the same day, conducted in the same way.  I was paid $200 each of those transactions.  I would not have done this without the persistent requests of the cooperating person.

PSR ¶ 15, at 5.

## PROCEDURAL BACKGROUND

A grand jury charged Rivas by Indictment, filed August 6, 2013 (Doc. 2), with two counts of distribution of a controlled substance (Counts 1 and 2), and made forfeiture allegations for $2,250.00.  See Indictment at 1-3, filed August 6, 2013 (Doc. 2); Motion for Discovery ¶ 1, at 1; Motion for Disclosure ¶ 1, at 1.  The charge against Rivas relates to the alleged undercover purchase of methamphetamines from Rivas on May 14, 2013.  See Motion for Discovery ¶ 5, at 2.  Others were indicted separately but contemporaneously.  See Motion for Discovery ¶ 4, at 2. Rivas was arrested on or about August 12, 2013, and others were arrested around the same time. See Motion for Discovery ¶ 1, at 1.  He made his initial appearance before the Court on that date. See Motion for Discovery ¶ 1, at 1; Clerk's Minutes of Hearing Cimarron Courtroom before Karen B. Molzen, U.S. Magistrate Judge at 1, filed August 12, 2013 (Doc. 5).  On August 13, 2013, Rivas appeared for arraignment at a detention hearing.  See Motion for Discovery ¶ 1, at 1; Arraignment/Detention Minute Sheet at 1, filed August 13, 2013 (Doc. 9)("Arraignment Sheet").

- 4 -

At the arraignment, Rivas entered a not guilty plea.  See Motion for Discovery ¶ 1, at 1; Arraignment Sheet at 1.  The Magistrate Judge released Rivas on conditions.  See Motion for Discovery ¶ 1, at 1; Order Setting Conditions of Release at 1-3, filed August 14, 2013 (Doc. 14). Rivas remains compliant with the Conditions that the Magistrate Judge imposed.  See Motion for Discovery ¶ 1, at 1.

The Court set the trial for November 25, 2013.  See Order Granting Continuance of Trial Setting at 1, filed October 22, 2013 (Doc. 23); Motion for Discovery ¶ 1, at 1.  Rivas requested that a Magistrate Judge set a change of plea before the scheduled trial date.  See Motion for Discovery ¶ 1, at 1.  Rivas pled guilty to the charges in the Indictment.  See Motion for Discovery ¶ 2, at 2.

1. **Motion for Discovery.**

Rivas received initial discovery on August 19, 2013.  See Motion for Discovery ¶ 3, at 2. According to Rivas, the United States has provided reports reflecting the results of laboratory analysis of drugs allegedly connected with the charges against Rivas.  See Motion for Discovery ¶ 5, at 2. There is also a report reflecting the laboratory analysis of cocaine, which the laboratory received in August, 2013.  See Motion for Discovery ¶ 5, at 2.  There is little mention made in the discovery, however, of the relationship -- if any -- among the various individuals that the United States has targeted.  See Motion for Discovery ¶ 4, at 2.  There is no mention in any of the discovery about any transactions involving cocaine; cocaine is not mentioned at all except in the drug laboratory report.  See Motion for Discovery ¶ 5, at 3.

Rivas requested additional discovery by letter to the United States on August 20, 2013. See Motion for Discovery ¶ 3, at 2.  The United States did not provide any information in

response to Rivas' discovery request.  See Motion for Discovery ¶3, at 2.  Rivas also made that request by letter on October 30, 2013, and in telephone conversations and electronic mail transmissions with the United States.  See Motion for Discovery ¶ 3, at 2.  The United States provided no information or material in response to these repeated requests.  See Motion for Discovery ¶ 3, at 2.

Rivas moves the Court for an order compelling the United States to disclose the materials that the motion identifies.  Rivas contends that the matters about which he requests disclosure are relevant to sentencing issues.  See Motion for Disclosure ¶ 2, at 2.  Rivas anticipates that these matters will relate to questions concerning the drug, drug quantity, role in the offenses, and anticipated arguments for variance from the sentencing guidelines.  See Motion for Disclosure ¶ 2, at 2.  Rivas maintains that the discovery which the United States has provided has left questions concerning various aspects of the investigation leading to Rivas' indictment and arrest.  See Motion for Discovery ¶ 4, at 2.  For example, because the discovery included a laboratory report analyzing cocaine, he presumes that cocaine will become a part of the total drug quantity calculation and will impact the Court's analysis in determining a proper sentence, and so he asserts that he is entitled to information concerning the cocaine in the laboratory report.  See Motion for Discovery ¶ 5, at 3.  Rivas' counsel asserts that, without full disclosure, he "will be in the dark as to information which seems clearly to be in the government's possession," and "will not be able to adequately or effectively represent Mr. Gonzalez at sentencing."  Motion for Discovery ¶ 5, at 3.  Rivas argues that he is "entitled to all reports, recordings, photographs and other materials relating to any cocaine transactions, possession or use alleged to have occurred in relation to the arrest and charges in this case."  Motion for Discovery ¶ 5, at 3.

Rivas contends that the laboratory reports that the United States provided refer to an additional quantity of methamphetamine -- about three ounces -- that was from a transaction on July 19, 2013, involving a third person, not Rivas, delivering the methamphetamine to an undercover agent. <u>See</u> Motion for Discovery ¶ 6, at 3-4. He asserts that the discovery that the United States provided "includes a conclusory and cryptic assertion that Mr. Gonzalez was somehow involved in the discussions leading up to the July 19 undercover buy," but does not explain "how that conclusion is reached." Motion for Discovery ¶ 6, at 3-4. Rivas maintains that, because "it appears that this methamphetamine will be a part of the sentencing calculation and analysis," he is "entitled to all reports, recordings and other information regarding this methamphetamine transaction in order to properly prepare for sentencing." Motion for Discovery ¶ 6, at 4.

Rivas explained that, contemporaneous with filing the Motion for Discovery, he also filed the Motion for Disclosure, because he "believes that an individual was working as a confidential informant," but the discovery does not mention the person's involvement; he asserts that the suspected CI "was actively involved in persuading Mr. Gonzalez to participate in the conduct of which Mr. Gonzalez is accused," and so he is seeking discovery related to the CI. Motion for Disclosure ¶ 7, at 4.

Rivas explained that the United States sent an electronic mail transmission on October 11, 2013, "indicating that all available discovery had been provided"; he requests that the "Court set a hearing at which the officers and agents involved in this investigation be present to discuss the existence or non-existence of information responsive to Mr. Gonzalez' requests." Motion for Discovery ¶ 8, at 4-5.

- 7 -

2.      **Motion for Disclosure.**

In the Motion for Disclosure, Rivas moves the Court for an order requiring the United States to disclose the identity of, and other information about, the CI.  See Motion for Disclosure at 1.  He argues that the information is essential for his defense at sentencing, because it addresses his role in the offenses and his anticipated request for a variance "on the basis, among other grounds, of sentencing entrapment based on the conduct of the confidential informant." Motion for Disclosure ¶ 2, at 2.  Rivas' counsel contends that, without the requested information, he "will be unable to properly represent Mr. Gonzalez at sentencing, jeopardizing Mr. Gonzalez' rights to due process and effective assistance of counsel."  Motion for Disclosure ¶ 2, at 2.

Pursuant to Kyles v. Whitley, 514 U.S. 419 (1995), Brady v. Maryland, 373 U.S. 83 (1963), and Giglio v. United States, 405 U.S. 150 (1972), Rivas requests the CI's identity, whether the CI was working in any capacity for any government agency -- federal, state, or local -- and makes nineteen specific requests for information and material regarding the CI's involvement in this and other cases.  See Motion for Disclosure ¶ 3, at 2.  Rivas asks the Court to require the United States to disclose information such as the names and addresses for any CIs used in this case; whether the United States has used the CIs in other cases; any payments, rewards, or preferential treatment the United States has provided to the CIs or their families; the CIs' criminal history, criminal activities, and incarceration history; any prior misconduct while the CIs were performing their roles as informants; any information that the United States has regarding the CIs' credibility, mental or physical health, or narcotic or alcohol use or other dependency; the CIs' education, employment history, and military service; and the CIs' involvement in civil actions.  See Motion for Disclosure at 2-7.

Rivas argues that the United States should have to disclose the CI's identity in this case, because of the CI's active role in the case.  See Motion for Disclosure at 9.  Rivas contends that "the events giving rise to this prosecution would not have occurred absent the actions of the confidential informant," that the CI "is likely an eyewitness who possesses information that bears directly on the defense of the instance case," and that the CI is the "'only witness in a position to amplify or contradict the testimony of the government witnesses.'"  Motion for Disclosure at 9 (quoting Roviaro v. United States, 353 U.S. 53, 64 (1957)).  He argues that the United States should also produce information related to its prior use of the CI, because if the CI used undue persuasion in previous cases, he or she likely used similar tactics in this case.  See Motion for Disclosure at 10.  Further, Rivas asserts that the CI's prior testimony is important impeachment material, because "[p]revious false testimony is the strongest form of impeachment."  Motion for Disclosure at 11 (citing Bagley v. Lumpkin, 798 F.2d 1297 (9th Cir. 1986)).

Rivas requests detailed information and records regarding how the United States treated the CI and his or her family, including any preferential treatment, threats, paying money or promising financial rewards, and plea agreements.  See Motion for Disclosure at 11.  He argues that this information may show the CI's motivation in cooperating with the United States, and that the information is discoverable to show the CI's bias or hostility and is proper impeachment material.  See Motion for Disclosure at 12.  Rivas requests the CI's arrest and conviction record, unauthorized criminal activity, and other misconduct, because it is relevant to the CI's "credibility, bias, motive and modus operandi."  Motion for Disclosure at 13.  According to Rivas, "[t]his case may raise both sentencing entrapment and the defense of government overreaching, which will be centrally relevant to Mr. Gonzalez' arguments at sentencing.  The

issue of who initiated the criminal activity and who misled whom would be the primary focus of such a defense."  Motion for Disclosure at 13-14.  Rivas argues that, if the United States has the CI's probation records, the United States should disclose those records if they contain information that bears on the CI's credibility.  See Motion for Disclosure, at 14-15.  Rivas also requests the CI's personnel files, records and reports, including internal memoranda that may show the CI's bad character, so that he can use the information for impeaching the CI.  See Motion for Disclosure, at 15-16.  Rivas requests information reflecting the CI's credibility, mental health, drug use, and other dependencies, and argues that the information is discoverable and material to his defense.  See Motion for Disclosure at 16.  In his view, he is entitled to the information to discredit and impeach the CI.  See Motion for Disclosure at 16-17.

### 3.    Response.

The United States responds that Rivas has not provided "sufficient support for his overly broad and misplaced request," and that, because "'[t]he constitution does not grant criminal defendants the right to embark on broad or blind fishing expeditions among documents possessed by the Government,'" the Court should deny Rivas' requests.  Response at 2 (alteration in original)(quoting United States v. Mayes, 917 F.2d 457, 461 (10th Cir. 1990)).  The United States views Rivas' requests in two categories -- (i) "a general request for Brady/Giglio information," and (ii) "a request for specific information that should be provided as a part of discovery."  Response at 2.  Under the first category, the United States contends that Rivas misconstrues the Brady v. Maryland standard, which requires that "evidence must be favorable to the accused *and* material."  Response at 2 (emphasis in original).  The United States argues that Rivas did not show that the information he requests is "both favorable *and* material," and

that "'[t]he mere possibility that evidence is exculpatory does not satisfy the constitutional materiality standard.'"   Response at 3 (emphasis in original)(quoting United States v. Fleming, 19 F.3d 1325, 1331 (10th Cir. 1994)).   The United States asserts that it does not have any information that "would support a claim of innocence" and that, if it acquires any information that would support a claim of innocence, it will disclose that information to Rivas.   See Response at 3.   Regarding impeachment material, the United States acknowledges that it must disclose exculpatory evidence, including "evidence that would tend to impeach the credibility of cooperating witnesses," but that Rivas' "request for impeachment material" is "misplaced." Response at 3.   The United States argues that, because Rivas entered a guilty plea without a written plea agreement and chose not to proceed to trial, it does not have any obligation to disclose impeachment evidence.   See Response at 3 (citing United States v. Ruiz, 536 U.S. 622, 633 (2002)("[T]he constitution does not require the government to disclose impeachment evidence prior to entering into a plea agreement with a criminal defendant.")).

The United States also responds to the specific categories of discovery material that Rivas requested in the Letter from Marc H. Robert to Samuel Hurtado, sent August 20, 2013, filed December 2, 2013 (Doc. 32-1)("Discovery Request Letter").   Rivas requested, pursuant to rule 16(a)(1)(A) of the Federal Rules of Criminal Procedure, any statement he made; the United States asserts that it has "disclosed all evidentiary items relevant to the indictment to include audio recordings, photographs, investigative reports, and reports of laboratory analysis," and that it will disclose an additional one-page consent-to-search form.   Response ¶ 1, at 4.   Rivas requested arrest reports, notes, and dispatch tapes; the United States contends that it has disclosed investigative arrest reports pertaining to the charges for which Rivas was indicted,

including audio recordings, but that it is not aware of any video recordings, 911 calls, or dispatch tapes.  See Response ¶ 2, at 4-5.  The United States asserts that, while law enforcement must preserve notes, the United States does not have to disclose those notes and that it will "not disclose any notes to defendant unless compelled by the Court."  Response ¶ 2, at 4-5 (citing United States v. Harris, 543 F.2d 1247 (9th Cir. 1976)).  In response to Rivas' request for the "the identity of all law enforcement officers involved in the investigation and prosecution and their affiliation," the United States argues that it does not have to disclose its witnesses before trial, and that, because the case is not going to trial, the United States has not called any witnesses.  Response ¶ 3, at 5-6.  Further, the United States asserts that it would not, pursuant to the Jencks Act, 18 U.S.C. § 3500, have to disclose information regarding witnesses until after it calls the witnesses at trial.  Regarding Rivas' request for reports of scientific tests and examinations, the United States represents that it "has disclosed the results of all tests and examinations conducted upon the evidence relevant to the current charges set forth in the indictment against defendant," including the laboratory reports showing 52.3 net grams of actual methamphetamine from May 14, 2013, and 81.9 net grams of actual methamphetamine from July 15, 2013.  Response ¶ 5, at 7.  The United States explains that it disclosed a third laboratory report showing twenty-eight net grams of cocaine, but "represents that it will not seek to introduce the cocaine for purposes of sentencing."  Response ¶ 5, at 7-8.  Rivas requested his own prior record, and the United States says that it provided a copy of his record, which included only traffic-related offenses.  See Response ¶ 6, at 8.  Regarding Rivas' requests to view physical evidence and tangible objects, the United States explains that Rivas' counsel "is welcome to schedule a visit with the DEA any time he wishes," but that "he has not done so."  Response ¶ 8,

at 9.  See Response ¶ 10, at 9.  The United States explains that it did not respond to some of Rivas' requests when it did not possess the information requested or when such discovery does not exist, such as electronically stored information, warrantless surveillance or searches, results from Global Positioning System ("GPS") or other electronic tracking devices, cellular telephone tracking and locating, internet information or searches, or National Security Agency-acquired information, and that many of the requests overlapped with its continuing obligation to provide material evidence favorable to him pursuant to Brady v. Maryland.  See Response ¶¶ 12-27, at 16-21.

In response to Rivas' request for information regarding the CI, the United States argues that it should not be required to disclose the CI's identity, because the charges against Rivas are based on the two transactions from May 14, 2013, and the United States says that the CI "was not even present" during those transactions.  Response ¶ 11, at 11.  The United States asserts that it does not have to disclose the CI's identity, because the CI "did nothing more than put the undercover DEA agent in contact with defendant to buy methamphetamine."  Response ¶ 11, at 11.  According to the United States, the CI was present for the February 27, 2013, and April 30, 2013, drug transactions, but the United States is not charging Rivas for either transaction.  See Response ¶ 11, at 12.

> To the extent that counsel is concerned about the impact that the cocaine may have on defendant's sentence, the government is willing to disregard the cocaine for purposes of sentencing in order to protect the life of the confidential source. The government is also willing to disregard the 13.6 actual grams of methamphetamine purchased from defendant on February 27, 2013, for purposes of sentencing.  The DEA has expressed concern that the confidential source will be killed if the government is forced to disclose the confidential source's identity. Courts generally will not order disclosure where such disclosure would place the informant in personal danger and the prospective testimony is not exculpatory.

Response ¶ 11, at 12 (citations omitted).  The United States asserts that the amount of cocaine from the April 30, 2013, transaction, and the amount of methamphetamine from the February 27, 2013, transaction "is so small that it is unlikely to have any impact on defendant's estimated sentencing guideline range."  Response ¶ 11, at 13.  The United States emphasizes that it does not have to disclose the CI's identity, that it "has no intention of calling the confidential source as a witness at trial for the criminal conduct charged in the indictment," and that, because Rivas pleaded guilty, trial is "no longer a consideration."  Response ¶ 11, at 13.  The United States asks the Court to hold an in camera hearing "[i]n the event this Court determines that it cannot make a proper determination regarding the necessity of disclosure based on the facts presently available."  Response ¶ 11, at 15-16 (citing Gaines v. Hess, 662 F.2d 1364, 1369 (10th Cir. 1981)).

**4.    Reply.**

Rivas replies that the information he seeks is "essential" for his counsel to represent him at sentencing.  Mr. Gonzalez' Reply to Government's Consolidated Response to Motions for Discovery and for Disclosure of Information and Identity of Confidential Informant ¶ 2, at 1, filed January 2, 2014 (Doc. 36)("Reply").   According to Rivas, "[w]ithout the information requested in this motion, counsel will be unable to properly represent Mr. Gonzalez at sentencing, jeopardizing Mr. Gonzalez' rights to due process and effective assistance of counsel."  Reply ¶ 2, at 2.  Rivas argues that the United States' approach -- attempting to use the information that the CI provided while insulating the CI from disclosure -- "jeopardizes justice and due process, and also jeopardizes effective assistance of counsel."  Reply ¶ 5, at 2-3.  Rivas contends that, while confidential informants seek out the "big fish," they sometimes, "in their

zeal to please their handlers . . . go too far and create crimes which they can then use to provide

another body to the prosecutorial machine."  Reply ¶ 6, at 3.  According to Rivas, "[t]hat is what

happened in this case."  Reply ¶ 6, at 3.

> Before the government's confidential informant went to work on Mr. Gonzalez,
> he was not in the business of selling methamphetamine.   The confidential
> informant persistently asked Mr. Gonzalez to make a methamphetamine deal for
> him, and Mr. Gonzalez just as persistently said "no".  The informant's requests
> became so insistent that Mr. Gonzalez changed his mobile phone number not
> once, but twice, to try to avoid the informant's pestering.   Ultimately, Mr.
> Gonzalez lost his job, and the informant's pestering finally bore fruit. At the
> informant[']s request and urging, Mr. Gonzalez sold methamphetamine to an
> undercover law enforcement officer.  As such, the informant took a man who was
> not in the business of selling methamphetamine, coerced him into making a
> methamphetamine sale to a law enforcement officer for the informant's personal
> gain.   The informant consciously and intentionally placed Mr. Gonzalez in a
> position in which Mr. Gonzalez would not have placed himself absent the
> coercion of the confidential informant.

Reply ¶ 8, at 3-4.  Rivas asserts that he "believes, but is not certain," that he knows the CI's

identity: "The informant was a friend of Mr. Gonzalez' father.  He apparently got himself into

trouble with law enforcement, and entered into some kind of arrangement with law enforcement

to go forth and find others to prosecute in exchange for some kind of consideration."  Reply ¶ 7,

at 3.  He explains that he does not know, however, "[t]he nature and terms of this agreement, and

the nature and extent of the consideration."  Reply ¶ 7, at 3.

Rivas contends that the CI's role will be central to two factors that the Court will consider

at sentencing: the "'nature and circumstances of the offense' and 'history and characteristics of

the defendant'."  Reply ¶ 9, at 4 (quoting 18 U.S.C. § 3553(a)).  Regarding the first factor, Rivas

contends that "this offense would not have happened absent the energetic actions of the

government's confidential informant," but that, "[a]t a moment of financial difficulty, Mr.

Gonzalez ultimately succumbed to the unceasing persuasions of the informant."  Reply ¶ 11, at 5.

Regarding the second factor, Rivas explains that he "works for a living" and has an extensive

employment history, and that, "absent the confidential informant's consistent and persistent

coercion, Mr. Gonzalez would not be in this situation."  Reply ¶ 10, at 5.  Although he does not

think the facts fit the legal definition of entrapment, he contends that "the nature and

circumstances of this offense permit, indeed demand, an[] examination of the circumstances

surrounding the events leading to Mr. Gonzalez' arrest, and the role of the confidential informant

in creating the offense in the first place."  Reply ¶ 10, at 5.

Rivas argues that the information he seeks "is Brady material concerning potential

punishment" and is "'relevant to the defense of [the] accused' in its possible impact on the

sentence determined by the Court."  Reply ¶ 13, at 6 (alterations in original)(quoting Roviaro v.

United States, 353 U.S. at 60-61).  He asserts that "it is perhaps critical that Mr. Gonzalez knows

to a near certainty who the informant is," and that "[d]isclosure of the information sought could

be made in such a way as to limit its availability to the public while permitting Mr. Gonzalez full

access to the information needed to make his presentation to the Court."  Reply ¶ 14, at 7.  Rivas

contends that the CI is not in danger, as the United States asserts, because, "in spite

of Mr. Gonzalez' near certain knowledge of the identity of the informant, no harm has befallen

the informant as far as counsel's limited information would indicate."  Reply ¶ 15, at 7.

Rivas reiterates his request for discovery regarding the other drug transactions that are

not included in the Indictment, because those transactions "could be factors in the Court's

consideration of Mr. Gonzalez' sentence."  Reply ¶ 16, at 8.  "Given that . . . and the likelihood

that the probation officer will include all information considered relevant in the presentence

report regardless of the prosecutor's intentions, the information sought is indeed relevant to Mr. Gonzalez' sentencing presentation and the Court's sentencing analysis."  Reply ¶ 16, at 8.

    **5.**    <u>**Hearing**</u>.

    The Court held a hearing on January 8, 2014.  <u>See</u> Transcript of Hearing, taken January 8, 2014 ("Tr.").[2]  Rivas explained that he faces a fairly high sentencing range between zero and twenty years.  <u>See</u> Tr. at 2:9-13 (Robert).  He said that he thought that he knew the CI's identity; he suspected that the CI is Rivas' family friend who pushed Rivas to find some methamphetamine to sell to another person to whom the friend wanted to introduce Rivas.  <u>See</u> Tr. at 3:8-13 (Robert).  Rivas said that, after he lost his job, he "decided to do what this family friend was pestering him incessantly to do."  Tr. at 3:14-18 (Robert).  The Court questioned what Rivas would gain by learning the identity, if he already thought he knew the CI's identity.  <u>See</u> Tr. at 3:19-4:13 (Court, Robert).  Rivas explained that he does not want only the CI's identity, because he suspects he already knows that fact, but that he needs additional discovery to aid in his defense.  <u>See</u> Tr. at 4:14-24 (Robert).

    Rivas argued that he needs discovery related to the laboratory report, which indicated that there was cocaine, and that he thinks that discovery related to the CI and the laboratory report will help him make his case for sentence entrapment.  <u>See</u> Tr. at 5:4-21 (Robert).  The Court suggested that it could ask the probation officer to come to the hearing and find out whether some of Rivas' concerns about sentencing might drop out after the United States Probation Office ("USPO") prepared the PSR.  <u>See</u> Tr. at 5:22-6:5 (Court).  Rivas explained that he does

---

    [2] The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

not dispute that he sold methamphetamine twice in one day to an undercover officer, but he disputes "why that happened, the nature and circumstances of the offense, and the history and characteristics of the defendant." Tr. at 6:6-15 (Robert). He said that information about the CI will be important for the Court to consider during sentencing, including the CI's "untoward and coercive relationship" with Rivas, "and the result of his efforts . . . was to get Mr. Gonzalez, who is not a methamphetamine dealer, arrested for selling methamphetamine to an undercover cop." Tr. at 6:16-23 (Robert). Rivas said that his relationship with whom he believes is the CI will be an important part of his defense at sentencing. See Tr. at 7:6-21 (Robert). The Court noted that it does not normally see requests for discovery during the sentencing phase that are as extensive as Rivas' requests; Rivas did not know why other defendants might not request as much information, but argued that he needed the information he was requesting to adequately prepare his defense for sentencing. See Tr. at 7:22-9:1 (Court, Robert).

The Court turned the hearing to the specific requests that Rivas made in the Motion for Discovery. See Tr. at 10:1-3 (Court). On the drug quantity or drug type, Rivas noted that the United States said it would ignore the cocaine that was in the laboratory report, but he argued that he needed more discovery, because he did not know if the USPO would ignore the cocaine when it prepares the PSR. See Tr. at 10:4-19 (Court, Robert). Rivas argued that, even if the USPO ignores the cocaine, it will be relevant for sentencing to show his relationship with the CI. See Tr. at 10:19-11:3 (Robert). Rivas' counsel said he is aware of the two transactions with which Rivas is charged, but he requested additional information regarding any other methamphetamine transactions with which the United States believes Rivas is connected. See Tr. at 11:4-24 (Robert).

The United States explained that the DEA initiated the investigation about Rivas in February, 2013, based on information from a CI, who was working "in an undercover capacity at the direction of the DEA" and made a "controlled purchase" of methamphetamine from Rivas on February 27, 2013.  Tr. at 13:12-24 (Hurtado).  The United States said that, on February 27, 2013, "the confidential source acted alone," and Rivas was not charged for the methamphetamine he sold that day.  Tr. at 13:24-14:3 (Hurtado).  On April 30, 2013, the CI was working undercover for the DEA and arranged to buy cocaine from Rivas; Special Agent Eloy Montoya, who was also working undercover, accompanied the CI when the CI purchased twenty-eight net grams of cocaine from Rivas.  See Tr. at 14:4-14 (Hurtado).  The United States said that it did not intend to disclose the lab results that included cocaine.  See Tr. at 14:15-18 (Court).  The DEA continued its investigation, and on May 14, 2013, Montoya, without the CI's assistance, purchased methamphetamine from Rivas for $2,250.00, for which a grand jury indicted Rivas.  See Tr. at 14:19-15:1 (Hurtado).  On July 18, 2013, Montoya, again without the CI's assistance, arranged to purchase methamphetamine from Rivas, and Rivas put Montoya in contact with a person known at the time only as Jackie, who sold 81.9 grams of methamphetamine.  See Tr. at 15:2-10 (Hurtado).  The Grand Jury did not indict Rivas for the July 18, 2013, transaction.  See Tr. at 15:11-13 (Hurtado).

The United States said it wanted to frame the argument around the May 14, 2013, transaction only; the Court noted that Rivas was relying on an entrapment defense, and thus that it would not be appropriate to limit the hearing to only the one transaction.  See Tr. at 15:14-24 (Hurtado, Court).  The United States argued that, pursuant to United States v. Ortiz, 804 F.2d 1161 (10th Cir. 1986), "the disclosure of a confidential source's identity is not required where

the confidential source merely serves to introduce a drug dealer to an undercover agent," and that, because the Indictment is for the May 14, 2013, transaction, which occurred without the CI's involvement, the United States does not have to disclose the CI's identity.  Tr. at 16:6-23 (Hurtado).  The Court noted that Rivas said that he knows the CI's identity and that the CI may already be in danger, and asked whether the parties are "fighting about anything that has a real world consequence."  Tr. at 16:24-17:6 (Court).  The United States said that it is trying to lessen the CI's exposure, because the CI is "still involved in a series of ongoing investigations with the DEA in a proactive capacity."  Tr. at 17:7-18 (Hurtado).  The Court asked whether it could strike a balance by not requiring the United States to disclose CI's name, but if the CI is whom Rivas thinks he or she is, by precluding the United States from denying that the person was the CI; Rivas noted that he could subpoena the person he believes is the CI to the sentencing.  See Tr. at 17:19-18:12 (Court, Hurtado, Robert).  The United States argued that the Court's suggestion would implicitly reveal the CI's identity, which would set bad precedent for future cases; the Court questioned whether it would be precedent for any other cases, because the situation was unique in that Rivas said he knew almost to a certainty the CI's identity, while most defendants request disclosure because they do not know the informant's identity.  See Tr. at 18:14-19:15 (Court, Hurtado).  The United States argued that, had the case proceeded to trial, Rivas could not have subpoenaed whom he believes to be the CI to testify, because the charge was for the May 14, 2013, transaction, and the CI was not present for that transaction, and therefore, the CI would not be relevant in the trial.  See Tr. at 19:16-20:15 (Court, Hurtado).  The Court noted that it can consider more information at sentencing than it could at trial.  See Tr. at 20:16-22 (Court).  The United States argued that the existing case law does not require disclosure when the "informant

plays only a small or passive role in the offense charged, has no firsthand information, or where his potential disclosures are already known to the defendants," and that in this case, the CI "played no role at all." Tr. at 20:23-21:10 (Hurtado)(citing United States v. Moreno, 588 F.2d 490 (5th Cir. 1978)). The Court asked whether the CI could play a role in the sentencing enhancement. See Tr. at 21:11-15 (Court). The Court asked, based on United States v. Moreno, whether this situation was one where it should not force the United States to disclose the CI, and "just stop there and then let it play out however the defendant wants to play it out. And we'll deal with some of these issues about relevancy, how strong their argument is at sentencing." Tr. at 21:18-22:3 (Court). The United States maintained that, even though Rivas says he is nearly certain of the CI's identity, the CI's safety may be threatened if the United States has to disclose the CI's identity, or sit silent and implicitly confirm the CI's identity at the sentencing hearing, especially if the CI's identity is confirmed on the record, such as in the transcript. See Tr. at 22:4-18 (Hurtado). The United States suggested that the Court could seal the sentencing proceeding; Rivas said sealing the record may put him in danger, because some people who see sealed dockets assume that the defendant is cooperating. See Tr. at 23:17-24:15 (Hurtado, Court, Robert). The United States emphasized that it does not think that the CI would add anything relevant or material to the sentencing, because the CI was not present for the May 14, 2013, drug transaction, and the United States maintained that "[t]here is no exculpatory information that could be gleaned by having the confidential source here." Tr. at 25:12-16 (Hurtado). The United States compared the case to United States v. McKenzie, No. CR 08-1669 JB, 2010 WL 597971 (D.N.M. Jan. 28, 2010)(Browning, J.), in which the Court limited the defendant's discovery to events that occurred in Albuquerque, New Mexico, and did not order disclosure of

- 21 -

confidential sources of information out of Flagstaff, Arizona; the United States argued that, similarly, the Court should focus on the drug transaction that occurred on May 14, 2013, and not on other dates where the CI may have been present.  <u>See</u> Tr. at 25:17-26:12 (Hurtado).  The United States said that it did not intend to disclose the laboratory report which included the cocaine and that, although it has been disclosed, it is irrelevant to a sentencing entrapment argument.  <u>See</u> Tr. at 27:2-8 (Court, Hurtado).  The United States said that it has not disclosed any other information regarding the cocaine transaction, such as investigative reports or audio recordings, if they exist.  <u>See</u> Tr. at 27:14-28:1 (Court, Hurtado).  The United States said it referenced the February 27, 2013, methamphetamine transaction to fully disclose information to Rivas, that it told Rivas about that transaction on page 12 of the Response, but that it is withholding investigative reports, audio recordings, and lab results pertaining to the February 27, 2013, cocaine transaction and the April 30, 2013, methamphetamine transaction.  <u>See</u> Tr. at 28:3-29:9 (Hurtado, Court, Robert).  The United States asserted that it has produced everything it has, including arrest reports, notes, and tapes, from the drug transaction with which Rivas has been charged.  <u>See</u> Tr. at 30:18-31:6 (Court, Hurtado).

Addressing the sentencing entrapment issue, the United States explained that Rivas' argument is that he would not be in this situation had it not been for the CI, and that the CI somehow coerced or pressured him to traffic drugs; the United States pointed to <u>United States v. McClelland</u>, 72 F.3d 717 (9th Cir. 1995), a case from the United States Court of Appeals for the Ninth Circuit which listed a variety of factors to consider when determining whether a defendant is entitled to a downward departure when the government unduly pressured a defendant who was predisposed to commit a crime.  <u>See</u> Tr. at 31:9-32:4 (Hurtado).  The United States said that it

could not find a case from the United States Court of Appeals for the Tenth Circuit recognizing the sentencing entrapment issue.  See Tr. at 32:5-12 (Court, Hurtado).  "Those factors include the amount of inducement, the level of reluctance on the defendant's part and who acted first."  Tr. at 33:2-4 (Hurtado).  The United States asserted that United States v. McClelland presented a situation in which the defendant was in the midst of a divorce and custody battle, was emotionally vulnerable and susceptible to the government agent's influence, and repeatedly expressed reluctance to commit the crime, but that the agents prodded and encouraged him whenever he expressed hesitation, and that this case is factually different, because Rivas did not express reluctance during the drug transactions.  See Tr. at 33:4-17 (Hurtado).  The United States said that it would like to call Montoya to establish a record that Rivas was not reluctant; Rivas objected, arguing that, before the United States could call Montoya, he needed the discovery he was requesting.  See Tr. at 33:17-34:10 (Hurtado, Robert).  The Court said it would permit the United States to establish the record to respond to Rivas' sentencing entrapment defense.  See Tr. at 34:19-22 (Court).

### a.    Testimony from Special Agent Eloy Montoya.

The United States called Montoya, who testified that he initially contacted Rivas on April 30, 2013, after Task Force Officer Lawrence Montano requested that Montoya conduct a series of undercover purchases with individuals in the Los Lunas and Belen, New Mexico, area.  See Tr. at 35:11-37:16 (Hurtado, Montoya).  Montoya testified that, at the April 30, 2013, meeting, he and the CI were present with Rivas and a female later identified as Rebecca Miranda, and that during the meeting, Montoya purchased an ounce of cocaine directly from Rivas.  See Tr. at 37:22-38:18 (Hurtado, Montoya).  Montoya said the CI was present for the sole purpose of

introducing Montoya to Rivas.  <u>See</u> Tr. at 38:19-24 (Hurtado, Montoya).  He said he purchased $640.00 worth of cocaine, which weighed approximately 30.6 grams.  <u>See</u> Tr. at 39:2-5 (Montoya, Hurtado).  Montoya said that he spoke in English and Spanish to Rivas, that Rivas appeared to understand what Montoya was telling him, and that Rivas appeared calm and did not express reluctance in selling cocaine to Montoya.  <u>See</u> Tr. at 39:9-25 (Hurtado, Montoya).

Montoya said that the next interaction he had with Rivas was on May 14, 2013, that he directly contacted Rivas and discussed purchasing methamphetamine, and that the CI was not involved in calling or negotiating the purchase.  <u>See</u> Tr. at 40:1-41:1 (Hurtado, Montoya). Montoya testified that, for the May 14, 2013, meeting, he met Rivas, who was accompanied by another Hispanic female, at a store in Los Lunas; that they spoke in English and Spanish with each other; that the meeting's purpose was for Montoya to purchase methamphetamine; that Montoya asked for three ounces, but Rivas came up with one ounce and sold it for $1,300.00; and that Montoya said he had money to purchase more methamphetamine.  <u>See</u> Tr. at 41:5-42:15 (Hurtado, Montoya).  Montoya testified that, at the time, an ounce of methamphetamine in the Albuquerque area was selling between $800.00 and $1,000.00 an ounce, and that $1,300.00 was substantially above the market price.  <u>See</u> Tr. at 42:19-43:7 (Hurtado, Montoya).  Montoya testified that, during the transaction, Rivas did not appear confused and did not express reluctance to complete the drug transaction, and that Rivas' tone of voice was "friendly, it was cordial, it was business.  We spoke of cars, we spoke of different things.  It was calm."  Tr. at 43:8-19 (Hurtado, Montoya).  Montoya explained that he gave Rivas the $1,300.00 for the methamphetamine, and that Rivas took custody of the money, did not try to explain that the money was not for him, and did not suggest that he was undergoing any personal or financial

hardships in life that forced him into a situation where he was selling drugs.  See Tr. at 44:22-45:7 (Hurtado, Montoya).  Montoya said that he did not pressure or coerce Rivas to sell him methamphetamine, and that, to his knowledge, the CI never coerced or pressured Rivas into selling methamphetamine.  See Tr. at 45:8-21 (Hurtado, Montoya).  Montoya said that, after he purchased one ounce for $1,300.00, he expressed interest in wanting to buy more methamphetamine and showed Rivas the additional cash he had for the subsequent purchase, and that Rivas called someone whom Montoya believed was the supplier; Montoya and Rivas met later that same day, and Montoya purchased an additional ounce of methamphetamine for $1,250.00.  See Tr. at 43:23-44:21 (Hurtado, Montoya); id. at 45:22-46:11 (Hurtado, Montoya).  Montoya testified that Rivas did not seem confused with Montoya's request to purchase more methamphetamine and did not express reluctance to sell the drugs, and that his tone of voice was "normal" and "friendly."  Tr. at 46:12-23 (Hurtado, Montoya).

Montoya said that Rivas arranged for Montoya to purchase an additional ounce of methamphetamine on July 19, 2013, and that a female identified only as Jackie met Montoya in Los Lunas to sell the methamphetamine.  See Tr. at 46:24-48:10 (Hurtado, Montoya).  Montoya testified that the CI was not involved in the May 14, 2013, or July 19, 2013, transactions, nor did the CI negotiate the prices.  See Tr. at 48:11-19 (Hurtado, Montoya).  Montoya said that the conversation he had with Rivas was recorded, and the United States played a portion of the audio recording.  See Tr. at 49:25-50:9 (Hurtado, Montoya).  The first clip introduced "the who, what, when, where of the transaction that's about to take place," when Montoya was "getting ready to conduct the deal on May 14, 2013."  Tr. at 30:16-24 (Montoya, Hurtado)(playing UC Meth Buy -- 11:01 AM 05/14/13 DVD, Exhibit 1 to the hearing ("UC DVD")).  The next segment involved

- 25 -

Montoya discussing that Rivas had vehicle issues, but Montoya testified that he still believed the deal would proceed at that point.  See Tr. at 51:1-17 (Hurtado, Montoya)(playing UC DVD starting at 37:41).  Montoya testified that, when he and Rivas attempted to meet in the Big 5 Sporting Center parking lot in Los Lunas, they did not know what vehicle the other was driving; Rivas called and said he was driving a Black Mustang.  See Tr. at 51:18-52:6 (Hurtado, Montoya)(playing UC DVD at 46:15-49:55).  After the men made contact, Montoya said he saw Rivas with the methamphetamine and handed him the cash.  See Tr. at 52:19-52:24 (Montoya, Hurtado).  According to Montoya, they had a "casual conversation," and spoke about cars, the woman who had been with Rivas during a previous transaction, and Montoya's undercover story that he was a drug dealer from out of town and he wanted more drugs to take with him; Montoya said that he asked Rivas to call his source for more drugs and complained about the price, and that Rivas said that, if Montoya would buy on a more regular basis, Rivas could get him a better price.  Tr. at 53:1-15 (Montoya).  Montoya said that Rivas did not appear uneasy, and that he and Rivas can be heard "laughing, having a good time."  Tr. at 53:16-24 (Hurtado, Montoya).  Montoya described the next portion of the audio:

> What we're trying to do is to wait to see if he can provide additional ounces of methamphetamine.  We're talking about vehicles, my undercover story to him is that I live up in the Denver area, I transport cars that I purchase at a[n] auto auction, bring them down here, that also I have family members that I visit while I'm here but I turn around and I return and the story goes not to lose time or money I take drugs back with me.  This is why I'm trying to take additional amounts testify methamphetamine with me and at the same time he's on the cellular telephone talking to someone.

Tr. at 54:3-14 (Montoya)(playing UC DVD at 49:55-53:05).  After listening to the final portion of audio, Montoya explained that he and Rivas were waiting for "another phone call from what I

believe is the source of the meth to see if he's able to produce the additional amounts of methamphetamine," and that they are talking generally "about cars, about work" when Rivas received "a phone call and says he can come up with additional amounts, but it's going to be an hour and a half.  I'm trying to speed this up, safety sake, trying to get this thing done."  Tr. at 54:15-55:4 (Hurtado, Montoya)(playing UC DVD at 53:05-56:21).   Montoya said he showed Rivas the money, and they agreed to meet a half hour later.  See Tr. at 55:4-7 (Montoya). Montoya said that he did not threaten, coerce, or pressure Montoya into selling him methamphetamine.  See Tr. at 55:8-15 (Hurtado, Montoya).  After concluding the audio portions of the UC DVD, the United States moved to admit it as Exhibit 1; Rivas objected that the matter would be properly addressed at sentencing after he had an opportunity to review the discovery he had requested, but agreed that the UC DVD would be relevant to the sentencing entrapment argument, and the Court admitted the UC DVD.  See Tr. at 55:16-56:7 (Hurtado, Robert, Court).

Before cross-examining Montoya, Rivas' counsel noted that he did not feel as though he could properly cross-examine Montoya without the discovery he requested, and that he objected to "being put in the position of potentially violating Mr. Gonzalez' rights to due process [and] effective assistance of counsel."  Tr. at 56:20-25 (Robert).   On cross examination, Montoya testified that Rivas did not supply the methamphetamine and that he had to contact someone else to obtain the methamphetamine, and that Montoya did not know if Rivas set the price.  See Tr. at 57:3-17 (Robert, Montoya).  Montoya said that the first time he worked with the CI was when he purchased an ounce of cocaine on April 30, 2013, that he was not part of the February, 2013, transaction with the CI, and that he did not know if someone else worked with the CI or how the CI got involved.  See Tr. at 57:18-58:6 (Robert, Montoya).  Montoya testified that, other than

April 30, 2013, he had not been in the same room or same physical space when the CI and Rivas had been together, either before or after April 30, 2013.  See Tr. at 58:19-59:6 (Robert, Montoya).  Montoya agreed that he did not "have any factual notion about what conversations took place between" Rivas and the CI other than on April 30, 2013.  Tr. at 59:16-19 (Robert, Montoya).  He said that he did not talk with the CI about his conversations with Rivas, but that, regarding the April 30, 2013, transaction, he wrote a report, a recording was made, he did not know if any photographs were taken, and Task Force Officer Montano was the case agent in charge of that deal.  See Tr. at 59:23-60:13 (Robert, Montoya).  Montoya said that Rivas had changed his telephone number, that Montoya received the telephone number from Montano, but that he did not know if Rivas had changed his telephone number "because he was trying to avoid the confidential informant's phone calls."  Tr. at 60:24-61:12 (Robert, Montoya).  Montoya said that he knew Rivas' brother Willy, who was arrested around the same time that Rivas was arrested.  See Tr. at 62:6-14 (Robert, Montoya).

On redirect examination, Montoya testified that he was not "the controlling agent for the confidential source in this case" and that the CI "would not have any reason to report back" to Montoya.  Tr. at 62:24-63:7 (Hurtado, Montoya).

### b.    Testimony from Task Force Officer Lawrence Montano.

The United States called Montano, a DEA task force officer for Valencia County, New Mexico.  See Tr. at 63:19-64:8 (Hurtado, Montano).  Montano testified that he was the case agent on Rivas' case, that the CI told him that Rivas was "selling narcotics in the Valencia County area," and that he initiated the investigation in February, 2013, which lasted until May. Tr. at 64:18-65:9 (Hurtado, Montano).  He said that he used the CI during Rivas' investigation,

that he did not "instruct the confidential source to pressure or coerce Mr. Rivas into selling drugs to the confidential source or anybody else," and that he was not aware that the CI had coerced or pressured Rivas. Tr. at 64:11-24 (Hurtado, Montano). The United States asked the Court to hold a portion of the hearing outside the presence of Rivas and his counsel, "with respect to a threat that was made against the confidential source." Tr. at 65:25-66:10 (Hurtado, Court). Rivas objected: "[O]n the basis of effective assistance of counsel and due process, . . . what the prosecutor proposes is inappropriate and denies Mr. Gonzalez his constitutional rights, and his right to confrontation as well, Your Honor." Tr. at 67:5-12 (Robert).

Rivas cross-examined Montano; Montano testified that he "sign[ed] up the confidential source," that he was present when Rivas met with the CI on February 27, 2013, and April 30, 2013, that he did not participate in or listen to any other conversations between Rivas and the CI, and that he did not know "what might have passed between Rivas and the source other than your presence at these two transactions," including whether "the source was threatening or coercing or intimidating or in some other way influencing Mr. Gonzalez." Tr. at 68:19-70:6 (Robert, Montano). Montano said that there were recordings made of the February 27, 2013, and April 30, 2013, transactions, that he thought there were photographs, but that he did not think there was video. See Tr. at 70:7-20 (Robert, Montano).

### c.    Continued Arguments at Hearing.

The United States explained that it tried to establish that "[t]here is nothing in the record to suggest that [Rivas] was at any time pressured to sell drugs," that Rivas' conversation with Montoya was a "very causal [and] jovial social conversation," and that there was "nothing to suggest that the defendant was under the influence of drugs or suffering or experiencing any

personal or financial hardships" like the defendant in <u>United States v. McClelland</u>.  Tr. at 71:16-72:5 (Hurtado).  According to the United States, Rivas' "allegation of sentencing entrapment is wholly baseless, just meritless."  Tr. at 72:5-7 (Hurtado).

> [T]he United States would argue that there is no basis for which the Government should be held to disclose the identity of the confidential informant.   The confidential informant does not offer anything material, anything relevant, anything exculpatory to the charges listed in the indictment against the defendant for which he already pleaded guilty to.

Tr. at 72:12-19 (Hurtado).   The United States clarified that it has not disclosed discovery pertaining to the two deals not listed in the Indictment and that it resists disclosure related to the CI.  <u>See</u> Tr. at 72:25-73:15 (Court, Hurtado).  The Court asked what discovery the United States would provide if a defendant called a witness at trial; the United States responded that, if the witness were a civilian, the amount of information it would disclose would depend on a case-by-case analysis, but that if the witness were a professional law enforcement witness, the United States would have a continuing duty to disclose any impeachment information.  <u>See</u> Tr. at 73:16-74:22 (Court, Hurtado).

Rivas' counsel said that, although the Court questioned earlier why he was seeking the extent of discovery in this case, he "learned a lot about my case today, about Mr. Gonzalez' case, that I didn't know and it seems unfortunate that it has to come to this for something even remotely [close to] full discovery to happen, but I'm certainly of the opinion that these sorts of things are necessary and should be done more often because otherwise we're left in the dark." Tr. at 75:13-22 (Robert).  Rivas' counsel explained that he was asking for discovery to know whether he could credibly make a sentencing entrapment argument and that, without discovery, he could not effectively assist Rivas.  <u>See</u> Tr. at 76:1-25 (Robert).

The Court decided to permit the United States to present testimony in camera regarding a threat against the CI.   The Court identified several cases that indicated that an in camera procedure would be appropriate to determine the credibility of a confidential informant and determine whether a court should disclose a confidential informant's identity, and explained that it would be appropriate for it also to consider evidence in camera regarding a threat against the CI to help it determine whether to disclose the CI's identity in this case.   See Tr. at  77:18-79:23 (Court)(citing Gaines v. Hess, 662 F.2d at 1369; United States v. Cruz, 680 F.3d 1261, 1263 (10th Cir. 2012); United States v. Singh, 922 F.2d 1169, 1172-73 (5th Cir. 1991)).   The Court said that it would hear testimony regarding a threat made against the CI "for the purpose of determining whether the CI should be disclosed," but would not consider the evidence at sentencing.  Tr. at 80:18-22 (Court).   The Court held an in camera proceeding, in which the United States questioned Montano about Montano's concern for the CI's safety.   See Tr. at 81:5-85:4 (Hurtado, Montano, Court).

Rivas argued that Montoya's and Montano's testimony did not address his intended sentencing argument -- what he called "imperfect entrapment" -- and that, while United States v. McClelland addresses factors that a jury may consider to determine if there was entrapment, the case predates United States v. Booker and does not address the imperfect entrapment sentencing issue that is present in this case.  Tr. at 85:7-86:2 (Robert).   Rivas conceded that, had he proceeded to trial, he knew that he might not have gotten a jury instruction on entrapment and that he would not likely have been able to persuade a jury that he was entrapped, but he argued that the Court may still consider the "nature and circumstances of the offense and the history and characteristics of the defendant."  Tr. at 86:8-24 (Robert).   Rivas emphasized that Roviaro v.

<u>United States</u> requires disclosure of information when it is relevant and helpful in the defense, and argued that the standard applies to sentencing as well as trial.  <u>See</u> Tr. at 87:10-14 (Robert). Mr. Marc Robert, Rivas' counsel, explained that, to effectively defend Rivas at sentencing, he needs the discovery he requested to show how the CI's repeated efforts persuaded Rivas "to do this thing which ultimately got him arrested and charged and which ultimately led him to plead guilty," and that, without the information, he would not "be able to fully understand much less present to the Court the issues that are relevant."  Tr. at 88:2-11 (Robert).  Mr. Robert said he did not know anything about the transactions in February, 2013, and April, 2013, except for what the United States revealed in the Response and what it discussed during the hearing.  <u>See</u> Tr. at 88:12-17 (Robert).  Mr. Robert said that the United States has photographs and recordings of the transactions, and that he wants that information, because he is not convinced that Rivas sold cocaine, and because it is important for his imperfect entrapment and sentencing entrapment arguments.  <u>See</u> Tr. at 88:12-89:3 (Robert).  Mr. Robert acknowledged that the discovery might undermine his arguments and that he needed to know that information, too, before the sentencing hearing.  <u>See</u> Tr. at 89:4-7 (Robert).   Rivas argued that the United States has made its determination what is relevant, but that he believes the information leading up to the May drug transactions is also relevant for his defense.  <u>See</u> Tr. at 89:10-90:14 (Robert).  Rivas clarified that there are three categories of information he is seeking through discovery: (i) the February, 2013, and July, 2013, methamphetamine transactions; (ii) the April, 2013, cocaine transaction; and (iii) information about the CI.  <u>See</u> Tr. at 90:21-91:22 (Court, Robert).

The Court asked whether Rivas would be satisfied with the United States not revealing the CI's identity, but allowing Rivas to subpoena the person he thinks is the CI to the sentencing

hearing.  See Tr. at 91:23-92:8 (Court).  Rivas explained that, if he subpoenas the person he believes is the CI and it turns out not to be correct, this strategy may do "more harm than good," because a general subpoena would be part of the record rather than a more nuanced approach, such as a protective order that would restrict the dissemination of information, and that he does not want to place anyone at risk; he noted, however, that, if he is correct who he believes is the CI, the CI thus far has not been harmed, and so the United States' concerns about the CI's safety may be unfounded.  Tr. at 92:9-93:16 (Robert).  Although he admitted to likely knowing the CI's name, Rivas argued that he also needs additional information regarding the extent and duration of the relationship which the CI had with the United States and which may show the CI's motivations during his interactions with Rivas.  See Tr. at 93:23-94:15 (Robert).  Mr. Robert argued that the information "goes to the heart of the constitutional right of effective assistance of counsel," because, without the discovery he is requesting, he cannot know how best to advise Rivas.  Tr. at 94:15-95:5 (Robert).

The Court said it would not order any disclosures and would not take any prophylactic measure against Rivas from subpoenaing the witness, but would not grant the motions to the extent they require disclosure of the CI's identity.  Regarding the February 27, 2013, and April 30, 2013, transactions, the Court said it would see what the PSR does with them, but if they fall out of the case, it would not require further disclosure.  See Tr. at 95:1-96:22 (Court).

In the PSR, the USPO describes the "Offense Conduct" as including the May 14, 2013, transaction and the July 15, 2013, transaction.  PSR ¶ 6, at 3; id. ¶ 11, at 4.  In the section titled "Offense Behavior Not Part of Relevant Conduct," the PSR includes the drug transactions from February 27, 2013, and April 30, 2013.  PSR ¶¶ 30-31, at 6-7.  The PSR explains that the United

States did not charge Rivas with the drugs from these two transactions "in order to protect the identity of the confidential source."  PSR ¶ 30, at 6.  <u>See</u> PSR ¶ 31, at 7.

### LAW REGARDING THE UNITED STATES' DUTY TO DISCLOSE IN CRIMINAL CASES

In <u>Brady v. Maryland</u>, the Supreme Court of the United States explained that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  373 U.S. at 87.  In <u>Giglio v. United States</u>, the Supreme Court extended the prosecution's disclosure obligation to evidence that is useful to the defense in impeaching government witnesses, even if the evidence is not inherently exculpatory.  <u>See</u> 405 U.S. at 153; <u>Douglas v. Workman</u>, 560 F.3d 1156, 1172-73 (10th Cir. 2009)("[N]o distinction is recognized between evidence that exculpates a defendant and 'evidence that the defense might have used to impeach the [State's] witnesses by showing bias and interest.'")(quoting <u>United States v. Bagley</u>, 473 U.S. 667, 676 (1985)).  Finally, the Supreme Court has refined <u>Brady v. Maryland</u> and clarified that it is not necessary that a defendant request exculpatory evidence; "regardless of request, favorable evidence is material, and constitutional error results from its suppression by the government 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'"  <u>Kyles v. Whitley</u>, 514 U.S. at 433 (quoting <u>United States v. Bagley</u>, 473 U.S. at 682).  <u>See Douglas v. Workman</u>, 560 F.3d at 1172 ("The government's obligation to disclose exculpatory evidence does not turn on an accused's request."); <u>United States v. Summers</u>, 414 F.3d 1287, 1304 (10th Cir. 2005)("[T]he prosecution has an affirmative duty to disclose exculpatory evidence clearly

supporting a claim of innocence even without request.").  On the other hand, "[i]t is well settled that there is no affirmative duty upon the government to take action to discover information which it does not possess."  United States v. Badonie, No. CR 03-2062 JB, 2005 WL 2312480, at *2 (D.N.M. Aug. 29, 2005)(Browning, J.)(internal quotation marks omitted).  "A prosecutor does not have a duty . . . to obtain evidence from third parties."  United States v. Badonie, 2005 WL 2312480, at *2.

During a criminal prosecution, the Federal Rules of Criminal Procedure and the Constitution of the United States of America require the United States to disclose certain evidence to a criminal defendant.  Rule 16 of the Federal Rules of Criminal Procedure is one source that imposes such a duty on the United States.  The Due Process Clause of the United States Constitution is another source imposing a duty to disclose on the United States.

### 1.    Rule 16.

Rule 16 of the Federal Rules of Criminal Procedure provides:

Upon a defendant's request, the government must permit the defendant to inspect and to copy or photograph books, papers, documents, data, photographs, tangible objects, buildings or places, or copies or portions of any of these items, if the item is within the government's possession, custody, or control and:

> (i)    the item is material to preparing the defense;

> (ii)   the government intends to use the item in its case-in-chief at trial; or

> (iii)  the item was obtained from or belongs to the defendant.

Fed. R. Crim. P. 16(a)(1)(E).

Criminal defendants may not, however, embark on a "broad or blind fishing expedition among documents possessed by the Government."  Jencks v. United States, 353 U.S. 657, 667

(1957)(quoting Gordon v. United States, 344 U.S. 414, 419 (1953)).  Rule 16(a)(2) provides, in part, that rule 16 "does not authorize the discovery or inspection of reports, memoranda, or other internal government documents made by an attorney for the government or other government agent in connection with investigating or prosecuting the case."  Fed. R. Crim. P. 16(a)(2).  The Supreme Court has interpreted the term "defense" in this statute as referring to "an argument in response to the prosecution's case in chief."  United States v. Armstrong, 517 U.S. 456, 462 (1996)("We reject this argument, because we conclude that in the context of Rule 16 'the defendant's defense' means the defendant's response to the Government's case in chief.").

2. **Due Process Clause.**

"The Due Process Clause requires the United States to disclose information favorable to the accused that is material to either guilt or to punishment."  United States v. Padilla, No. 09-3598, 2011 WL 1103876, at *5 (D.N.M. Mar. 14, 2011)(Browning, J.).  In Brady v. Maryland, the Supreme Court explained that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  373 U.S. at 87.  In Giglio v. United States, the Supreme Court extended the prosecution's disclosure obligation to evidence that is useful to the defense in impeaching government witnesses, even if the evidence is not inherently exculpatory.  See 405 U.S. at 153; Douglas v. Workman, 560 F.3d 1156, 1172-73 (10th Cir. 2009)("[N]o distinction is recognized between evidence that exculpates a defendant and 'evidence that the defense might have used to impeach the [United States'] witnesses by showing bias and interest.'" (quoting United States v. Bagley, 473 U.S. 667, 676 (1985)));  United States v. Abello-Silva, 948 F.2d 1168, 1179 (10th Cir. 1991)("Impeachment evidence

merits the same constitutional treatment as exculpatory evidence."), <u>overruled on other grounds as recognized in</u> <u>United States v. Martinez</u>, 78 F. App'x 679, 685 (10th Cir. 2003)(unpublished). Finally, the Supreme Court has refined <u>Brady v. Maryland</u> and clarified that it is not necessary that a defendant request exculpatory evidence; "regardless of request, favorable evidence is material, and constitutional error results from its suppression by the government 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" <u>Kyles v. Whitley</u>, 514 U.S. 419, 433 (1995)(quoting <u>United States v. Bagley</u>, 473 U.S. at 682). <u>See</u> <u>Douglas v. Workman</u>, 560 F.3d at 1172 ("The government's obligation to disclose exculpatory evidence does not turn on an accused's request."); <u>United States v. Summers</u>, 414 F.3d 1287, 1304 (10th Cir. 2005)("[T]he prosecution has an affirmative duty to disclose exculpatory evidence clearly supporting a claim of innocence even without request."). "[T]he Due Process Clause does not require the government to disclose before trial the names of its witnesses, just so the defense can have sufficient time to investigate their backgrounds for impeachment information." <u>United States v. Ashley</u>, 274 F. App'x 693, 697 (10th Cir. 2008). <u>See</u> <u>Weatherford v. Bursey</u>, 429 U.S. 545, 559 (1977)("It does not follow from the prohibition against concealing evidence favorable to the accused that the prosecution must reveal before trial the names of all witnesses who will testify unfavorably.").

a.   **Timing of the Disclosure.**

The prosecution's obligation to disclose evidence under <u>Brady v. Maryland</u> can vary depending on the phase of the criminal proceedings and the evidence at issue. As a general matter, "[s]ome limitation on disclosure delay is necessary to protect the principles articulated in <u>Brady v. Maryland</u>." <u>United States v. Burke</u>, 571 F.3d 1048, 1054 (10th Cir. 2009). The Tenth

Circuit has recognized that "[i]t would eviscerate the purpose of the <u>Brady</u> rule and encourage gamesmanship were we to allow the government to postpone disclosures to the last minute, during trial." <u>United States v. Burke</u>, 571 F.3d at 1054. "[T]he belated disclosure of impeachment or exculpatory information favorable to the accused violates due process when an 'earlier disclosure would have created a reasonable doubt of guilt.'" <u>United States v. Burke</u>, 571 F.3d at 1054. As the Tenth Circuit has stated:

> Where the district court concludes that the government was dilatory in its compliance with <u>Brady</u>, to the prejudice of the defendant, the district court has discretion to determine an appropriate remedy, whether it be exclusion of the witness, limitations on the scope of permitted testimony, instructions to the jury, or even mistrial.

<u>United States v. Burke</u>, 571 F.3d at 1054. Notably, "not every delay in disclosure of <u>Brady</u> material is necessarily prejudicial to the defense." <u>United States v. Burke</u>, 571 F.3d at 1056. "To justify imposition of a remedy, the defense must articulate to the district court the reasons why the delay should be regarded as materially prejudicial." <u>United States v. Burke</u>, 571 F.3d at 1056. Courts should, "[w]hen assessing the materiality of <u>Giglio</u> information, . . . consider the significance of the suppressed evidence in relation to the entire record." <u>United States v. Gonzalez-Montoya</u>, 161 F.3d 643, 650 (10th Cir. 1998).

When a prosecutor's <u>Brady v. Maryland</u> obligations are triggered, however, they "continue[ ] throughout the judicial process." <u>Douglas v. Workman</u>, 560 F.3d at 1173. For instance, the obligation to disclose material under <u>Brady v. Maryland</u> can arise during trial. <u>See</u> <u>United States v. Headman</u>, 594 F.3d at 1183 (10th Cir. 2010)("Although <u>Brady</u> claims typically arise from nondisclosure of facts that occurred before trial, they can be based on nondisclosure of favorable evidence (such as impeachment evidence) that is unavailable to the government until

trial is underway.").   Additionally, the disclosure obligation continues even while a case is on direct appeal.  See United States v. Headman, 594 F.3d at 1183; Smith v. Roberts, 115 F.3d 818, 819, 820 (10th Cir. 1997)(applying Brady v. Maryland to a claim that the prosecutor failed to disclose evidence received after trial but while the case was on direct appeal).

The Supreme Court has held that the restrictions from Brady v. Maryland do not require "preguilty plea disclosure of impeachment information."  United States v. Ruiz, 536 U.S. 622, 629 (2002)("We must decide whether the Constitution requires that preguilty plea disclosure of impeachment information.  We conclude that it does not.").  The Supreme Court recognized that "impeachment information is special in relation to the fairness of a trial, not in respect to whether a plea is voluntary."  United States v. Ruiz, 536 U.S. at 632 (emphasis in original).   It acknowledged that, "[o]f course, the more information the defendant has, the more aware he is of the likely consequences of a plea, waiver, or decision, and the wiser that decision will likely be," but concluded that "the Constitution does not require the prosecutor to share all useful information with the defendant."  United States v. Ruiz, 536 U.S. at 632.  It stated: "It is particularly difficult to characterize impeachment information as critical information of which the defendant must always be aware prior to pleading guilty given the random way in which such information may, or may not, help a particular defendant."  United States v. Ruiz, 536 U.S. at 630.  It further related:

> [T]his Court has found that the Constitution, in respect to a defendant's awareness of relevant circumstances, does not require complete knowledge of the relevant circumstances, but permits a court to accept a guilty plea, with its accompanying waiver of various constitutional rights, despite various forms of misapprehension under which a defendant might labor.

United States v. Ruiz, 536 U.S. at 630.  The Supreme Court concluded that "a constitutional

obligation to provide impeachment information during plea bargaining, prior to entry of a guilty

plea, could seriously interfere with the Government's interest in securing those guilty pleas that

are factually justified, desired by defendants, and help to secure the efficient administration of

justice." United States v. Ruiz, 536 U.S. at 630.

> The Tenth Circuit has reiterated these principles from United States v. Ruiz:

> > Despite these representations of a knowing and voluntary plea in the plea agreement and at the plea colloquy, Mr. Johnson asserts that his plea was not knowing and voluntary because he did not know that he was giving up a claim that the government failed to disclose impeachment evidence. The Supreme Court, however, foreclosed this exact argument in United States v. Ruiz, by holding that the government has no constitutional obligation to disclose impeachment information before a defendant enters into a plea agreement. Ruiz emphasized that "impeachment information is special in relation to the fairness of a trial, not in respect to whether a plea is voluntary." Rather, "a waiver [is] knowing, intelligent, and sufficiently aware if the defendant fully understands the nature of the right and how it would likely apply in general in the circumstances -- even though the defendant may not know the specific detailed consequences of invoking it." Mr. Johnson understood that he was giving up his right to cross examine government witnesses. He therefore generally knew what he was giving up, and his appeal waiver was not unknowing or involuntary.

United States v. Johnson, 369 F. App'x 905, 906 (10th Cir. 2010)(unpublished). [3]  The Tenth

---

[3] United States v. Johnson is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A) ("Unpublished decisions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005)(citations omitted). The Court finds that United States v. Johnson, United States v. Dighera, 217 F. App'x 826 (10th Cir. 2007)(unpublished), and United States v. Johnson, 117 F.3d 1429, 1997 WL 381926 at *3 (10th Cir. 1997)(unpublished table decision) have persuasive value with respect to a material issue,

Circuit has stated in another case: "As the Supreme Court stated in United States v. Ruiz, '[T]he Constitution does not require the Government to disclose material impeachment evidence prior to entering a plea agreement with a criminal defendant.'" United States v. Dighera, 217 F. App'x 826, 828 (10th Cir. 2007)(unpublished)(alteration in original)(citation omitted). Nevertheless, the Tenth Circuit, in an unpublished opinion, held that the standard outlined in United States v. Ruiz does not apply to exculpatory evidence but rather only to impeachment evidence:

> Ruiz is distinguishable in at least two significant respects. First, the evidence withheld by the prosecution in this case is alleged to be exculpatory, and not just impeachment, evidence. Second, Ohiri's plea agreement was executed the day jury selection was to begin, and not before indictment in conjunction with a "fast-track" plea. Thus, the government should have disclosed all known exculpatory information at least by that point in the proceedings. By holding in Ruiz that the government committed no due process violation by requiring a defendant to waive her right to impeachment evidence before indictment in order to accept a fast-track plea, the Supreme Court did not imply that the government may avoid the consequence of a Brady violation if the defendant accepts an eleventh-hour plea agreement while ignorant of withheld exculpatory evidence in the government's possession.

United States v. Ohiri, 133 F. App'x 555, 562 (10th Cir. 2005). The Tenth Circuit qualified its holding in United States v. Ohiri, stating that the case presented "unusual circumstances." United States v. Ohiri, 133 F. App'x at 562.

Circuit courts have split on the issue whether Brady v. Maryland's restrictions apply to suppression hearings, although it is not likely that a prosecutor must disclose impeachment evidence before a suppression hearing in light of the Supreme Court's conclusion in United States v. Ruiz that a prosecutor does not have to disclose impeachment evidence before the entry of a guilty plea. In an unpublished opinion, the Tenth Circuit, without discussing whether Brady

---

and will assist the Court in its disposition of this Memorandum Opinion and Order.

v. Maryland applies to a suppression hearing, rejected a defendant's argument that the prosecution violated Brady v. Maryland by failing to disclose impeachment evidence before a suppression hearing on the basis that the evidence was not impeachment evidence and not material. See United States v. Johnson, 117 F.3d 1429, 1997 WL 381926 at *3 (10th Cir. 1997)(unpublished table decision). Specifically, the Tenth Circuit found:

> Given the circumstances, and applying Bagley, [a case where the Supreme Court stated that evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different,] to our examination of the record, we conclude that disclosure of the evidence existing at the time of the hearing, even if impeaching, would not establish a reasonable probability that the outcome of the suppression hearing would have been different. First, we question whether the evidence in question would have been admitted at the suppression hearing. Even if it had been admitted, however, in light of [the defendant's] lack of truthfulness, our confidence in the result of the hearing has not been undermined. Therefore, we hold that the evidence was not material, and that its nondisclosure by the prosecution does not constitute a Brady violation.

United States v. Johnson, 1997 WL 381926, at *3 (citation omitted). The United States Court of Appeals for the District of Columbia Circuit has recognized that "it is hardly clear that the Brady line of Supreme Court cases applies to suppression hearings," because "[s]uppression hearings do not determine a defendant's guilt or punishment, yet Brady rests on the idea that due process is violated when the withheld evidence is 'material either to guilt or to punishment.'" United States v. Bowie, 198 F.3d 905, 912 (D.C. Cir. 1999). Without deciding the issue and in an unpublished opinion, the United States Court of Appeals for the Sixth Circuit quoted with approval this language from United States v. Bowie. See United States v. Bullock, 130 F. App'x 706, 723 (6th Cir. 2005)(unpublished)("Whether the suppression hearing might have come out the other way, however, is of questionable relevance to the Brady issues at stake here."). The

United States Court of Appeals for the Fifth Circuit and the Ninth Circuit held, before the Supreme Court issued its United States v. Ruiz decision, that Brady v. Maryland restrictions apply to suppression hearings.   See United States v. Barton, 995 F.2d 931, 935 (9th Cir. 1993)("[W]e hold that the due process principles announced in Brady and its progeny must be applied to a suppression hearing involving a challenge to the truthfulness of allegations in an affidavit for a search warrant."); Smith v. Black, 904 F.2d 950, 965-66 (5th Cir. 1990)("Timing is critical to proper Brady disclosure, and objections may be made under Brady to the state's failure to disclose material evidence prior to a suppression hearing."), vacated on other grounds, 503 U.S. 930 (1992)).  The United States Court of Appeals for the Seventh Circuit held that, under its precedent and the law from other circuits, it was not "obvious" for clear-error purposes that "Brady disclosures are required prior to suppression hearings."  United States v. Scott, 245 F.3d 890, 902 (7th Cir. 2001).

### b.    The Materiality Requirement.

The holding in Brady v. Maryland requires disclosure only of evidence that is both favorable to the accused, and "material either to guilt or to punishment."   373 U.S. at 87. "Evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  United States v. Bagley, 473 U.S. at 682.  See United States v. Allen, 603 F.3d 1202, 1215 (10th Cir. 2010), cert denied 131 S. Ct. 680 (2010).  A "reasonable probability" is a "probability sufficient to undermine confidence in the outcome."   United States v. Bagley, 473 U.S. at 682 (internal quotation marks omitted).  The Tenth Circuit has noted that "[t]he mere possibility that evidence is exculpatory does not satisfy the constitutional materiality standard."  United States v. Fleming,

19 F.3d 1325, 1331 (10th Cir. 1994).   The Tenth Circuit has also found that "[d]uplicative impeachment evidence is not material."   Douglas v. Workman, 560 F.3d at 1173.   "To be material under Brady, undisclosed information or evidence acquired through that information must be admissible."   Banks v. Reynolds, 54 F.3d 1508, 1521 n.34 (10th Cir. 1995)(quoting United States v. Kennedy, 890 F.2d 1056, 1059 (9th Cir. 1989)).

The Supreme Court, in Cone v. Bell, 556 U.S. 449 (2009), recently noted:

> Although the Due Process Clause of the Fourteenth Amendment, as interpreted by Brady, only mandates the disclosure of material evidence, the obligation to disclose evidence favorable to the defense may arise more broadly under a prosecutor's ethical or statutory obligations.   See Kyles, 514 U.S. at 437 ("[T]he rule in Bagley (and, hence, in Brady) requires less of the prosecution than the ABA Standards for Criminal Justice Prosecution Function and Defense Function 3-3.11(a) (3d ed. 1993)").   See also ABA Model Rule of Professional Conduct 3.8(d) (2008)("The prosecutor in a criminal case shall" "make timely disclosure to the defense of all evidence or information known to the prosecutor that tends to negate the guilt of the accused or mitigates the offense, and, in connection with sentencing, disclose to the defense and to the tribunal all unprivileged mitigating information known to the prosecutor, except when the prosecutor is relieved of this responsibility by a protective order of the tribunal").

556 U.S. at 470 n.15.   Favorable evidence is only material and thus subject to mandated disclosure when it "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."   Cone v. Bell, 556 U.S. at 470 (quoting Kyles v. Whitley, 514 U.S. at 435).

The burden is on the United States to produce exculpatory materials; the burden is not on the defendant to first point out that such materials exist.   See Kyles v. Whitley, 514 U.S. at 437 (stating that the prosecution has an affirmative duty to disclose evidence, because "the prosecution, which alone can know what is undisclosed, must be assigned the consequent responsibility to gauge the likely net effect of all such evidence and make disclosure when the

point of 'reasonable probability' is reached"); <u>United States v. Padilla</u>, 2011 WL 1103876, at *6. The United States' good faith or bad faith is irrelevant.  <u>See</u> <u>Brady v. Maryland</u>, 373 U.S. at 87; <u>United States v. Quintana</u>, 673 F.2d at 299 ("Under <u>Brady</u>, the good or bad faith of government agents is irrelevant.").  "This means, naturally, that a prosecutor anxious about tacking too close to the wind will disclose a favorable piece of evidence." <u>Kyles v. Whitley</u>, 514 U.S. at 439.  The United States has an obligation to "volunteer exculpatory evidence never requested, or requested only in a general way," although the obligation only exists "when suppression of the evidence would be of sufficient significance to result in the denial of the defendant's right to a fair trial." <u>Kyles v. Whitley</u>, 514 at 433 (internal quotation marks omitted).  On the other hand, "[t]he Constitution, as interpreted in <u>Brady</u>, does not require the prosecution to divulge every possible shred of evidence that could conceivably benefit the defendant." <u>Smith v. Sec'y of N.M. Dep't of Corr.</u>, 50 F.3d 801, 823 (10th Cir. 1995).  Additionally, "[t]he constitution does not grant criminal defendants the right to embark on a broad or blind fishing expedition among documents possessed by the Government." <u>United States v. Mayes</u>, 917 F.2d 457, 461 (10th Cir. 1990)(quoting <u>Jencks v. United States</u>, 353 U.S. at 667)(internal quotation marks omitted).

### c.      <u>Evidence Must Be in the United States' Possession.</u>

"It is well settled that there is no 'affirmative duty upon the government to take action to discover information which it does not possess.'" <u>United States v. Tierney</u>, 947 F.2d 854, 864 (8th Cir. 1991)(quoting <u>United States v. Beaver</u>, 524 F.2d 963, 966 (5th Cir. 1975)).  <u>Accord</u> <u>United States v. Kraemer</u>, 810 F.2d 173, 178 (8th Cir. 1987)(explaining that the prosecution is not required "to search out exculpatory evidence for the defendant"); <u>United States v. Badonie</u>, No. CR 03-2062 JB, 2005 WL 2312480, at *2 (D.N.M. Aug. 29, 2005)(Browning, J.).  On the

other hand, "a prosecutor's office cannot get around <u>Brady</u> by keeping itself in ignorance, or by compartmentalizing information about different aspects of a case." <u>Carey v. Duckworth</u>, 738 F.2d 875, 878 (7th Cir. 1984).   Under <u>Brady v. Maryland</u>, "[a] prosecutor must disclose information of which it has knowledge and access." <u>United States v. Padilla</u>, 2011 WL 1103876, at *7 (citing <u>United States v. Bryan</u>, 868 F.2d 1032, 1037 (9th Cir. 1989)).   "A prosecutor may have a duty to search files maintained by other 'governmental agencies closely aligned with the prosecution' when there is 'some reasonable prospect or notice of finding exculpatory evidence.'" <u>United States v. Padilla</u>, 2011 WL 1103876, at *7 (quoting <u>United States v. Brooks</u>, 966 F.2d 1500, 1503 (D.C. Cir. 1992)).   A prosecutor does not have a duty, however, to obtain evidence from third parties.   <u>See</u> <u>United States v. Combs</u>, 267 F.3d 1167, 1173 (10th Cir. 2001)(observing that <u>Brady v. Maryland</u> does not oblige the government to obtain evidence from third parties).

### d.   <u>Standard for Permitting New Trial.</u>

Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires.   <u>See</u> Fed. R. Crim. P. 33(a).   Motions for new trials are, however disfavored and "should only be granted with great caution." <u>United States v. Quintanilla</u>, 193 F.3d 1139, 1146 (10th Cir. 1999)(reversing district court's grant of a new trial motion based in part on alleged violations under <u>Brady v. Maryland</u>).   A defendant seeking a new trial based on an alleged <u>Brady v. Maryland</u> violation has the burden to "prove by a preponderance of the evidence: (1) the government suppressed evidence; (2) the evidence was favorable to the defendant; and (3) the evidence was material." <u>United States v. Reese</u>, --- F.3d ---, 2014 WL 1042781 at *6 (10th Cir. March 19, 2014).   <u>Accord</u> <u>United States v. Velarde</u>, 485

F.3d 553, 558 (10th Cir. 2007); United States v. Gould, No. 03-2274, 2011 WL 1103805, at *6

(D.N.M. Mar. 16, 2011)(Browning, J.), aff'd on other grounds by 672 F.3d 930 (10th Cir. 2012).

"Evaluation of a Brady claim asserted in a motion for a new trial involves an application of

[those] three elements . . . and not the five-prong . . . test utilized in typical newly discovered

evidence claims." United States v. Quintanilla, 193 F.3d at 1149 n.10 (citation omitted). "While

an open file policy may suffice to discharge the prosecution's Brady obligations in a particular

case, it often will not be dispositive of the issue." Smith v. Sec'y of N.M. Dep't of Corr., 50

F.3d at 828 (emphasis in original)(internal quotation marks omitted).

> On the one side, showing that the prosecution knew of an item of favorable
> evidence unknown to the defense does not amount to a Brady violation, without
> more.  But the prosecution, which alone can know what is undisclosed, must be
> assigned the consequent responsibility to gauge the likely net effect of all such
> evidence and make disclosure when the point of "reasonable probability" is
> reached.  This in turn means that the individual prosecutor has a duty to learn of
> any favorable evidence known to the others acting on the government's behalf in
> the case, including the police.  But whether the prosecutor succeeds or fails in
> meeting this obligation . . . the prosecution's responsibility for failing to disclose
> known, favorable evidence rising to a material level of importance is inescapable.

Kyles v. Whitley, 514 U.S. at 437 (citation omitted).  The Tenth Circuit reviews "de novo a

district court's ruling on a Brady claim asserted in the context of a new-trial motion." United

States v. Reese, 2014 WL 1042781 at *6.  In United States v. Reese, the Tenth Circuit reviewed

the district court's decision to grant a new trial after the United States withheld impeachment

evidence of one of the United States' witnesses who had investigated the defendants: at the time

of trial, the Federal Bureau of Investigation was investigating the witness for alleged criminal

activities.  See 2014 WL 1042781, at *1.  Although the United States withheld favorable

evidence, the Tenth Circuit determined that the evidence was not material, because the witness

was "not a critical witness."  2014 WL 1042781, at *11-*12.  The Tenth Circuit explained that "video evidence," and not the witness's testimony, "provided the principal link" between the illegal conduct and the defendants, and, thus, reversed the district court's order that had granted a new trial.  2014 WL 1042781, at *12.

### LAW REGARDING THE DISCLOSURE OF AN INFORMANT'S IDENTITY

The government has a privilege "to withhold from disclosure the identity of persons who furnish information of violations of law to officers charged with enforcement of that law." Roviaro v. United States, 353 U.S. at 59.  "The purpose of the privilege is the furtherance and protection of the public interest in effective law enforcement.  The privilege recognizes the obligation of citizens to communicate their knowledge of the commission of crimes to law-enforcement officials and, by preserving their anonymity, encourages them to perform that obligation."  Roviaro v. United States, 353 U.S. at 59.  "Anonymity of informants encourages communications to law enforcement officers."  Usery v. Local Union 720, Laborers' Int'l Union of N. Am., AFL-CIO, 547 F.2d 525, 527 (10th Cir. 1977).  Cf. United States v. Brantley, 986 F.2d 379, 383 (10th Cir. 1993)("Nor must the government supply the defendant with information about an informer when the individual introduces suspected traffickers to narcotics agents."); United States v. Ortiz, 804 F.2d 1161, 1166 (10th Cir. 1986)("We have ruled previously that the government is not required to supply information about an informer to a defendant when the informer merely provides the initial introduction.").

The privilege is not absolute, however, and where "the disclosure of an informer's identity . . . is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way."  Roviaro v. United States, 353 U.S. at

- 48 -

60-61.  The Supreme Court in <u>Roviaro v. United States</u> stated that the desirability of calling the informant as a witness, or at least interviewing the informant in advance of trial, is a matter for the accused, rather than the government, to decide.  <u>See</u> 353 U.S. at 64.  When an informant is a "participant in and a material witness to" the alleged criminal transaction, the disclosure of his or her identity is sometimes required.  <u>Roviaro v. United States</u>, 353 U.S. at 65.  The standard for disclosure of CIs who play an active, as opposed to a passive, role in the investigation is not fixed; rather, the court must consider: "(1) the crime charged, (2) the possible defenses, (3) the possible significance of the informer's testimony, and (4) other relevant factors."  <u>Roviaro v. United States</u>, 353 U.S. at 62.  In <u>Roviaro v. United States</u>, for example, the informant "helped to set up the criminal occurrence and had played a prominent part in it.  His testimony might have disclosed an entrapment."  353 U.S. at 64.  The Supreme Court found that the district court's failure to order disclosure of the informant's identity "in the face of repeated demands by the accused for his disclosure" was prejudicial error.  353 U.S. at 64-65.

"The Tenth Circuit's take on this analysis is well-known."  <u>United States v. Padilla</u>, No. CR 09-3598 JB, 2010 WL 4337819, at *7 (D.N.M. Sept. 3, 2010)(Browning, J.).  The Tenth Circuit's take on the analysis places the burden on the defendant to show that the informant's possible aid to the defendant outweighs the public's interest in protecting the flow of information, which the confidentiality of the informant's identity facilitates:

> The disclosure of a confidential informant's identity involves balancing the public interest in protecting the flow of information in a manner necessary for effective law enforcement against an individual's right to prepare his defense.  In making the determination as to whether disclosure is necessary, the court must consider the particular circumstances of the case, including the crime charged, the possible defenses, and the significance of the informer's testimony.  Where it is clear that the informant cannot aid the defense, the government's interest in keeping secret his identity must prevail over the defendant's asserted right of disclosure.  A

> defendant seeking disclosure has the burden of proof, and we review the district
> court's decision for an abuse of discretion.

United States v. Sinclair, 109 F.3d at 1538 (internal citations and quotation marks omitted).  See

United States v. McKenzie, No. CR 08-1669 JB, 2010 WL 597971, at **3-4 (D.N.M. Jan. 28,

2010)(Browning, J.)(quoting United States v. Sinclair, 109 F.3d at 1538.  "[T]he defendant must

present more than mere speculation about the possible usefulness of an informant's testimony."

United States v. Moralez, 908 F.2d at 567.  In sum,

> [a] defendant may obtain the identity and whereabouts of an informer if his
> testimony might be relevant to the defendant's case and justice would be best
> served by disclosure[, but d]isclosure of an informant is not required . . . where
> the information sought from the informer would be merely cumulative, or where
> the informant did not participate in the transaction in question.

United States v. Reardon, 787 F.2d 512, 517 (10th Cir. 1986)(internal citations omitted).  See

United States v. Moralez, 908 F.2d at 567.

The Court has required the United States to disclose a CI's identity where the CI "was

integrally involved in the criminal transaction[,] . . . observed the criminal transaction[,] and was

not a mere bystander."  United States v. Aguilar, 2010 WL 2977708, at *5.  In United States v.

Aguilar, the defendant, Aguilar, was one of three defendants charged with a conspiracy to traffic

in cocaine, stemming from a transaction between his two co-defendants and a government CI.

See 2010 WL 2977708, at *1.  In relation to the first factor that the Supreme Court identified in

Roviaro v. United States -- the crime charged -- the Court noted that "the crimes charged in this

case are relatively egregious -- conspiracy, possession with intent to distribute cocaine, and

possessing a gun while committing the other crimes."  2010 WL 2977708, at *6.  As to the

second and third Roviaro v. United States factors -- the possible defenses and the possible

significance of the informer's testimony -- it appeared that the defendant intended to argue that

he did not know his alleged co-conspirator possessed cocaine or that the drug transaction was

going to occur, and the Court found that, given the CI was present during the crime, the CI's

testimony "could be highly significant" to the defenses:

> The [CI] was present in the car with Mirabal, Aguilar, and Garner, and would be
> in a unique position to testify to what conversations, if any, occurred in the car
> and whether Aguilar took part in them.  After the four individuals arrived at the
> [CI]'s residence, again, the [CI] would be in a unique position to testify whether it
> appeared that Aguilar had any idea that the bag Mirabal retrieved from the car
> contained cocaine.  Once the three Defendants and the [CI] were inside the [CI]'s
> residence, the [CI] was able to observe Aguilar's demeanor and whether he
> actively participated in the drug transaction.  The [CI] could testify as to where
> Aguilar was and what he did while the [CI] made the alleged drug transaction
> with Mirabal.

2010 WL 2977708, at *6.  Additionally, the Court noted that the CI might provide relevant

information which no other witness could, because Aguilar's "alleged co-conspirators might try

to push blame away from themselves and on to Aguilar, and Villegas, a law-enforcement officer,

might tend to be biased toward the United States."  2010 WL 2977708, at *6.  The Court thus

granted Aguilar's motion and ordered the United States to disclose the CI's identity.  See 2010

WL 2977708, at *6.  The Court also incorporated the following protective order in its decision:

> Ms. Johnson[, Aguilar's attorney,] is ordered that she will not disclose the identity
> of the CI to anyone -- except the defense investigator she retains in this case --
> unless and until she seeks further leave of the Court.  Any information that the
> United States provides to Ms. Johnson regarding the CI may be discussed only
> with the investigator and the Assistant United States Attorneys who disclosed it.
> Finally, any information the United States provides must be returned once this
> case is closed.  These requirements should minimize the danger, if any, to the CI
> and perhaps permit law-enforcement to use him in a covert capacity again in the
> future, if they so desire.

2010 WL 2977708, at *6.

**LAW REGARDING SENTENCING-FACTOR MANIPULATION**

Sentencing-factor manipulation, also called sentencing entrapment, can serve as the basis "for a variance based on § 3553(a)'s requirement that a district court consider the 'nature and circumstances of the offense.'"   United States v. Beltran, 571 F.3d 1013, 1018-19 (10th Cir. 2009).  The Tenth Circuit analyzes claims of sentencing-factor manipulation under a standard of "outrageous governmental conduct."   United States v. Beltran, 571 F.3d at 1018-19.   Unlike some circuits, the Tenth Circuit does not apply a strict definition of conduct that qualifies as sentencing-factor manipulation, but rather applies the more amorphous "outrageous governmental conduct" test.   United States v. Beltran, 571 F.3d at 1018-19 (noting that the United States Courts of Appeals for the First and Eighth Circuits apply sentencing-factor manipulation "in extraordinary cases when the government improperly engages in conduct to expand the scope of a crime").  This outrageous governmental conduct standard assesses whether "considering the totality of the circumstances, the government's conduct is so shocking, outrageous and intolerable that it offends the universal sense of justice."   United States v. Beltran, 571 F.3d at 1018 (internal quotation marks omitted).  In a narrower context, the United States Sentencing Commission has recognized that a downward departure on an offense level relating to certain drug crimes may be appropriate when government agents set a price for a controlled substance substantially below market value which results in the defendant purchasing a greater quantity of a controlled substance than his resources would normally allow.   See U.S.S.G. § 2D1.1 cmt. n.14.  The Tenth Circuit has pointed out that, when the Tenth Circuit decided United States v. Lacey, 86 F.3d 956 (10th Cir. 1996), which allowed a departure for outrageous governmental conduct in the context of sentencing, "the sentencing guidelines were

mandatory and outrageous governmental conduct was a basis for a downward departure." United States v. Beltran, 571 F.3d at 1019.  The Tenth Circuit has recognized that the standard for a departure is generally measured under a stricter standard than a variance based on outrageous governmental conduct.  See United States v. Beltran, 571 F.3d at 1019.  The defendant bears the burden to prove sentencing-factor manipulation by a preponderance of the evidence.  See West v. United States, 631 F.3d 563, 570 (1st Cir. 2011).

In spite of the preponderance-of-the-evidence standard that applies to this test, the outrageous-governmental-conduct standard is a difficult standard for a defendant to meet.  The limited and circumscribed "nature of the outrageous conduct inquiry is due in primary part to the reluctance of the judiciary to second-guess the motives and tactics of law enforcement officials." United States v. Scull, 321 F.3d 1270, 1277 (10th Cir. 2003).  As a general matter, the government may need to complete several transactions with a defendant during the course of an undercover operation, because "[a]n undercover agent cannot always predict what information he will learn in the course of his investigation."  United States v. Scull, 321 F.3d at 1277 (alteration in original).  In the context of drug investigations, the Tenth Circuit has noted that courts must give police "leeway to probe the depth and extent of a criminal enterprise, to determine whether coconspirators exist, and to trace the drug deeper into the distribution hierarchy."  United States v. Scull, 321 F.3d at 1277.

## ANALYSIS

Rivas requests discovery related to the CI as well as related to the drug transactions that were not a part of the Indictment.  The United States asserts that it does not have to provide the CI's identity and that it has fulfilled its discovery obligations regarding the May 14, 2013,

transactions, which are the subject of the Indictment.  The Court will not require the United

States to disclose the CI's identity, but it will also not prohibit Rivas from calling witnesses to

the sentencing hearing to establish his imperfect-entrapment defense in support of his request for

a variance.  Because the PSR includes as relevant conduct the transactions from May 14, 2013,

and July 15, 2013, the Court will require the United States to provide discovery regarding the

July 15, 2013, transaction as well, or agree that the Court should not rely in any way on the part

of the PSR that includes transactions other than the May 14, 2013, transactions, for which Rivas

was indicted.

## I.  THE COURT WILL NOT ORDER THE UNITED STATES TO DISCLOSE THE CI'S IDENTITY OR OTHER INFORMATION RELATED TO THE CI.

Roviaro v. United States describes "the informer's privilege," which is "in reality the

Government's privilege to withhold from disclosure the identity of persons who furnish

information of violations of law to officers charged with enforcement of that law."  353 U.S. at

59.  "The purpose of the privilege is the furtherance and protection of the public interest in

effective law enforcement.  The privilege recognizes the obligation of citizens to communicate

their knowledge of the commission of crimes to law-enforcement officials and, by preserving

their anonymity, encourages them to perform that obligation."  353 U.S. at 59.  There is "no

fixed rule" in determining whether "disclosure is justifiable," but the Court must balance

> the public interest in protecting the flow of information against the individual's
> right to prepare his defense.  Whether a proper balance renders nondisclosure
> erroneous must depend on the particular circumstances of each case, taking into
> consideration the crime charged, the possible defenses, the possible significance
> of the informer's testimony, and other relevant factors.

353 U.S. at 62.  "Where it is clear that the informant cannot aid the defense, the government's interest in keeping secret his identity must prevail over the defendant's asserted right of disclosure."  United States v. Sinclair, 109 F.3d at 1538.

Taking these factors into consideration, the Court concludes that it should not order the United States to disclose the CI's identity or other discovery related to the CI.  With respect to the nature of the crimes charged, the crimes charged include two counts for "unlawfully, knowingly, and intentionally distribut[ing] a controlled substance, a mixture and substance containing a detectable amount of methamphetamine" "[i]n violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C)."  Indictment at 1.  The PSR indicates that the punishment can include not more than twenty years imprisonment, a $1,000,000.00 fine, and three years to life in supervised release.  See PSR at 1.  While there is not a mandatory minimum imprisonment sentence, the upper limits of the sentence are relatively steep and weigh in favor of requiring the United States to disclose the CI's identity.

Regarding the possible defenses, Rivas has indicated that he seeks discovery to determine if he can credibly argue sentencing entrapment -- that is, that the CI pressured and coerced him to sell the drugs, and that he would not have sold the drugs had the CI not pressured him.  The United States cites United States v. McClelland as the "leading authority" on the defense of sentencing entrapment.  In that case, the defendant, James McClelland, separated from his wife, and a few months later, spoke with Marc Russell about harming and killing his wife.  See 72 F.3d at 719.  Russell contacted the FBI about his conversations with McClelland and then agreed to secretly record his conversations with McClelland to verify McClelland's murder plot.  See 72 F.3d at 719-20.  During the recorded conversation, "McClelland displayed reluctance to go

- 55 -

through with the plan," but Russell "prodded McClelland when he expressed reluctance."  72 F.3d at 720.  "Eventually, at Russell's prompting, McClelland gave Russell permission to 'go for it,'" that is, to carry out the plot to murder McClelland's estranged wife.  72 F.3d at 720.  Over the next several days, the two men worked to finalize details, including purchasing tickets and supplies to poison McClelland's wife.  See 72 F.3d at 720.  During the time that Russell was to execute the plan, he called McClelland in the presence of FBI agents and told him that he was not able to contact McClelland's wife.  See 72 F.3d at 720.  McClelland was arrested a few days later and admitted that he knew about the murder plot, that he had purchased supplies to make the poisoning device, that "he was 99 percent sure Russell would never be able to carry out the plan, but that he wanted him to, and he would not regret it if he did."  72 F.3d at 720 (internal quotation marks and alteration omitted).  McClelland was charged and convicted for "causing another to travel in interstate commerce with the intent to commit murder-for-hire in violation of 18 U.S.C. § 1958"; he moved for acquittal based on entrapment, which the district court denied, and also moved for a downward departure at sentencing based on an imperfect entrapment defense, and the district court departed downward six levels.  72 F.3d at 720-21.

The Ninth Circuit affirmed the district court's denial of McClelland's entrapment defense, explaining that "[a] defense of entrapment has two elements: government inducement of the crime and the absence of predisposition on the part of the defendant."  72 F.3d at 722.

> Predisposition is established only after analyzing five factors: 1) the character and reputation of the defendant; 2) whether the government made the initial suggestion of criminal activity; 3) whether the defendant engaged in the activity for profit; 4) whether the defendant showed any reluctance; and 5) the nature of the government's inducement.  [United States v.] Citro, 842 F.2d [1149,] 1152 [(9th Cir. 1988)].  Although none of these factors is controlling, the defendant's reluctance to engage in the criminal activity is the most important.  Id.

- 56 -

72 F.3d at 722.  Because the jury found -- and the Ninth Circuit determined that there was sufficient evidence for the jury to find -- that McClelland was predisposed to commit the crime based on the second, third, and fourth factors, the Ninth Circuit determined that the "district court did not err in denying McClelland's motion, based on his allegation that he was entrapped as a matter of law, for judgment of acquittal."  72 F.3d at 723-24.

The government challenged the district court's decision to grant the six-level downward departure based on McClelland's imperfect entrapment defense.  See 72 F.3d at 724.  The Ninth Circuit explained that imperfect entrapment could be a ground for downward departure even when the defendant is predisposed to commit the crime:

> It appears that the government is contending that a defendant who was predisposed to commit a crime is not entitled to a departure.  This position reflects a fundamental misunderstanding of the difference between imperfect entrapment as a ground for downward departure and entrapment as a legal defense.  If the jury finds that a defendant who raises an entrapment defense was *not* predisposed to commit the crime, it would be obliged to find that he was not guilty.  Conversely, if the jury convicts a defendant who has raised an entrapment defense, then it has necessarily found him to be predisposed to commit the crime.  Since everyone convicted of a crime despite the assertion of an entrapment defense has been found to be predisposed, under the government's theory no one could ever receive a downward departure based on imperfect entrapment.   It is precisely those defendants who *are* predisposed but who are then pressured unduly by the government to go forward with the offense who are eligible to assert imperfect entrapment.

72 F.3d at 725 (emphasis in original).  The Ninth Circuit went on to explain that imperfect entrapment "is in some cases a legitimate ground for departure, because it may show that the defendant is both less morally blameworthy than an enthusiastic defendant and less likely to commit other crimes if not incarcerated."  72 F.3d at 726 (internal quotation marks and alteration omitted).  The Ninth Circuit stated that a district court determining "whether a departure is

warranted on the ground of imperfect entrapment" should consider "the amount of inducement, the level of reluctance on the defendant's part, and who acted first," 72 F.3d at 726 n.5, and explained the district court's findings that supported the downward departure:

> The district court found that there was clear and abundant evidence that Russell, an agent of the government, induced McClelland to commit the crime. The district court pointed to McClelland's vulnerable emotional state, his repeated expressions of reluctance, and Russell's frequent efforts to prod and encourage McClelland whenever McClelland expressed hesitation. The government has not explicitly challenged these findings. In any event, we note that there is sufficient evidence in the record to support them. The court made a reasonable inference that McClelland, who was in the midst of a divorce and custody battle, was emotionally vulnerable and susceptible to Russell's influence. The record shows that although McClelland initiated the idea of killing his wife, Russell repeatedly pushed McClelland to go forward, even when he expressed reluctance.

72 F.3d at 726 n.6. The Ninth Circuit held that "there was a legitimate legal basis for the district court's downward departure under 18 U.S.C. § 2553(b)." 72 F.3d at 726.

The United States said that it could not identify any Tenth Circuit cases recognizing the imperfect entrapment defense. Rivas pointed out that United States v. McClelland predates United States v. Booker and argued that United States v. McClelland has limited application in this case, because it involved a departure argument whereas Rivas is arguing for a variance. He asserted that the case applies to the extent it recognizes the difference between a trial defense of entrapment and a sentencing issue of imperfect entrapment. He explained that, if the discovery supports the argument, he anticipates arguing for a variance, because the CI's pressure goes to Rivas' disposition.

The Tenth Circuit has described "[s]entencing entrapment or manipulation" as

a "due process principle allowing a court to modify a sentence if, considering the totality of the circumstances, the government's conduct is so shocking, outrageous and intolerable that it offends the universal sense of justice," such as heavily pressuring the defendant during a sting operation to deal a higher volume of drugs

than he otherwise would, and can be the basis for a downward variance or departure.

United States v. Martinez, 482 F. App'x 315, 317 (10th Cir. 2012)(quoting United States v. Beltran, 571 F.3d 1013, 1019 (10th Cir. 2009)).  "Before Booker, [the Tenth Circuit] analyzed claims of sentencing entrapment or manipulation under the rubric of 'outrageous governmental conduct.'"  United States v. Beltran, 571 F.3d at 1018 (quoting United States v. Lacey, 86 F.3d 956, 963 (10th Cir. 1996)).  After United States v. Booker, the Tenth Circuit explained that "Booker did not alter the standard for a defendant to succeed on a claim of outrageous governmental conduct, but a defendant's claim of sentencing factor manipulation may also be considered as request for a variance from the applicable guideline range under the § 3553(a) factors."  United States v. Beltran, 571 F.3d at 1019.

> Other federal circuit courts of appeal have adopted varying approaches to claims of sentencing manipulation as an objection to a sentence.  The Sixth and D.C. Circuits categorically reject the doctrine of sentencing factor manipulation and do not consider such claims, while the Second, Third, Fourth, Fifth and Seventh Circuits have not expressly accepted or rejected a defense of sentencing factor manipulation.  The Ninth Circuit permits district courts to depart downward if a defendant can establish "imperfect entrapment," which is not a complete defense to a criminal charge but may provide a basis for a downward departure at sentencing.  The First and Eighth Circuits recognize the doctrine of sentencing manipulation as a basis for a downward departure in extraordinary cases when the government improperly engages in conduct to expand the scope of a crime.  The Eleventh Circuit has adopted an approach similar to Lacey and considers whether the certain sentencing factors should be filtered out or rejected due to the government's outrageous conduct.

United States v. Beltran, 571 F.3d at 1019 n.1 (citations omitted).  As the United States noted, and the Court agrees, it does not appear that the Tenth Circuit has adopted the Ninth Circuit's "imperfect entrapment" defense, but the Court notes that Rivas would be free to make a similar argument as a basis for a variance rather than a downward departure.  The need for Rivas to

make his defense, including his argument for a variance, weighs in favor of requiring the United

States to disclose the CI's identity.

The third factor -- the possible significance of the informers' testimony -- weighs against

disclosure, because the CI was not present for the two drug transactions that are included as

relevant conduct in the PSR.

> In making the requisite showing under the <u>Roviaro</u> standard, the defendant must present more than mere speculation about the possible usefulness of an informant's testimony.  Disclosure of an informant is not required where the information sought from him or her would be merely cumulative, or where the informant is not a participant in or a witness to the crime charged.

<u>United States v. Moralez</u>, 908 F.2d 565, 567 (10th Cir. 1990)(citations omitted).  The Tenth

Circuit has explained three broad categories of cases involving CIs:

> At one extreme are the cases where the informant is a mere tipster, and disclosure is not required.  At the other extreme are cases such as <u>Roviaro</u> itself where the informant has played a crucial role in the alleged criminal transaction, and disclosure and production of the informant are required to ensure a fair trial.  In addition, there are cases where there is a slight possibility a defendant might benefit from disclosure, but the government has demonstrated a compelling need to protect its informant.

<u>United States v. Moralez</u>, 908 F.2d at 568 (citations omitted).  On one hand, Rivas argues that, if

the CI is whom he thinks it is, the CI would be able to testify that Rivas did not want to sell

drugs, that Rivas attempted to avoid the CI's communications when the CI was encouraging him

to sell drugs, and that Rivas would not have sold drugs had it not been for the CI's pressure and

coercion.  Even if the CI would not clearly indicate whether he or she pressured Rivas into

selling drugs, the CI would be able to testify to what communications he or she had with Rivas

and if Rivas expressed hesitation to selling drugs when he was not in the presence of the

undercover officers.  In this sense, if Rivas is correct regarding the CI's role, then the CI is more

than a "mere tipster."  United States v. Moralez, 908 F.2d at 568.  On the other hand, the United

States has established that the CI was not present or a participant in the two relevant drug

transactions -- the transactions on May 14, 2013, and July 15, 2013.  During those two

transactions, Montoya's testimony indicated that Rivas sold drugs without expressing hesitation

or doubt, and Montoya did not pressure or coerce Rivas to sell the drugs.  Rivas has not

established the usefulness of the CI's testimony regarding the two drug transactions at issue here.

Overall, the Court concludes that this third factor weighs against disclosure.

      The Court may also consider other relevant factors to determine if it should require the

United States to disclose the CI's identity.  The Court has heard testimony in camera that the

CI's life may be in danger, because he or she has been threatened.  Further, Rivas thinks that he

knows whom the CI is, removing some of the need for the United States to disclose the CI's

identity and further jeopardize the CI.  These other factors also weigh against disclosure.

      Weighing the factors from Roviaro v. United States, the Court concludes that the

particular circumstances of this case do not require the United States to disclose the CI's identity.

Rivas may have other avenues to present his defense that he would not have sold drugs had it not

been for his family friend's pressure; even if the family friend is not the CI, he can call the

family friend to establish the conversations and alleged coercion this family friend used on him,

and he may also call other witnesses or present other evidence that will help him establish his

request for a variance based on the sentencing factors in 18 U.S.C. § 3553(a), including his

history and characteristics as well as the nature and circumstances of the offense.  Because the CI

was not present during the drug transactions that are included in the PSR as relevant conduct,

and because the CI has already been threatened, the Court will not require the United States to

disclose the identity or other background information regarding the CI.

If Rivas calls whom he thinks is the CI, the United States need not confirm he or she is the CI, but also may not deny that the person is the CI if the person is the CI.  In other words, the United States may not mislead the Court.  On the other hand, the Court is receptive to requests to seal the transcript or the proceedings, although it will also listen to arguments before doing so from Rivas whether such acts would put him in danger.

II.   **THE COURT WILL NOT COMPEL DISCOVERY RELATED TO THE FEBRUARY 27, 2013, OR APRIL 30, 2013, DRUG TRANSACTIONS, BUT WILL REQUIRE THE UNITED STATES TO DISCLOSE RELEVANT INFORMATION REGARDING THE JULY 15, 2013, DRUG TRANSACTION, OR TO STIPULATE THAT THE COURT WILL NOT RELY ON THE JULY 15, 2013, <u>TRANSACTION IN ANY WAY IN CRAFTING ITS SENTENCE</u>.**

Rivas has requested a broad range of discovery in this case related to four drug transactions: (i) the February 27, 2013, methamphetamine transaction with the CI; (ii) the April 30, 2013, cocaine transaction with the CI and a DEA agent; (iii) the May 14, 2013, methamphetamine transactions with Montoya, for which he was indicted; and (iv) the July 15, 2013, methamphetamine purchase through Jackie L/N/U.  He was indicted for only the May 14, 2013, transactions, and the PSR includes as relevant conduct only the May 14, 2013, and July 15, 2013, transactions.  Although the United States disclosed the laboratory report regarding the cocaine transaction, it said that it did not intend to disclose the laboratory report, but it disclosed it by accident.  Rivas has not been charged for this transaction, and the PSR does not include this transaction as relevant conduct.  The Court does not see how additional discovery related to the February 27, 2013, or April 30, 2013, transactions will help Rivas prepare his defense at sentencing, because the PSR does not include them as relevant conduct.  The Court will not

require the United States to provide any additional discovery related to these transactions, but the Court will also not rely on them for any purpose in crafting a sentence for Rivas.

The United States asserts that it has fulfilled its obligation to provide discovery related to the May 14, 2013, transactions, which are the only two transactions for which Rivas was indicted.  The PSR includes as relevant conduct the May 14, 2013, transactions and the July 15, 2013, transaction; the United States said at the hearing that it has produced some discovery related to the July 15, 2013, transaction, such as the laboratory report, but indicated that it had not produced discovery to the same extent as it had for the May 14, 2013, transactions.  Because the PSR includes the July 15, 2013, transaction as relevant conduct, the Court concludes that Rivas is entitled to discovery on that transaction if the Court is going to consider that transaction in determining an appropriate sentence.  Accordingly, absent a stipulation that the Court will not rely in any way on the July 15, 2015, transaction, the Court will order the United States to produce additional discovery related to the July 15, 2013, transaction.  The United States must disclose discovery in its possession regarding the July 15, 2013, transaction to the same extent it has disclosed discovery in its possession regarding the May 14, 2013, transaction, including: (i) materially exculpatory evidence pursuant to Brady v. Maryland and Giglio v. United States; (ii) any of Rivas' statements, pursuant to rule 16 of the Federal Rules of Criminal Procedure; (iii) investigative and arrest reports from the transaction; (iv) if the United States calls any witnesses at sentencing, then it must disclose impeachment evidence after the witness is called, pursuant to the Jencks Act, 18 U.S.C. § 3500; (v) any audio or video recordings or photographs; and (vi) reports of scientific tests and examinations.  The Court will require the United States to make these disclosures related to the July 15, 2013, methamphetamine transaction, because the PSR

includes that transaction as relevant conduct, and thus, Rivas should have discovery related to that transaction to prepare his defense for sentencing.  The Court understands that the United States has already produced some of this discovery, including the laboratory report from the July 15, 2013, transaction, but emphasizes that the United States should ensure that it has complied with its discovery obligations regarding the July 15, 2013, transaction just as it asserts it has complied with its discovery obligations regarding the two transactions that took place on May 14, 2013, for which Rivas was indicted.[4]

On the other hand, the Court understands from the hearing that the United States intended to focus its arguments on the May 14, 2013, transactions; if the United States will stipulate that the Court should not consider in any way in its sentencing calculation the July 15, 2013, transaction, and the United States stipulates that the Court should consider only the May 14, 2013, transactions in determining Rivas' sentence, then the Court will not require further production.  The choice is the United States'.  The Court concludes, however, that it would not be fair to Rivas to rely on the July, 15, 2013, transaction without further information.

As currently calculated in the PSR, the base offense level under U.S.S.G. § 2D1.1(a)(5) is 32.  Section 2D1.1(a)(5) specifies that the base offense level is "the offense level specified in the Drug Quantity Table set forth in subsection (c), except that if (A) the defendant receives an adjustment under § 3B1.2 (Mitigating Role); and (B) the base offense level under subsection (c) is . . . level 32, decrease by 2 levels."   U.S.S.G. § 2D1.1(a)(5).   The Drug Quantity Table

---

[4] The Court is not requiring the United States at this time to disclose information regarding the CI, because the United States has indicated, through Montoya's testimony at the hearing, that the CI was not present at the July 15, 2013, transaction.  If, however,  the United States does not stipulate that the Court should ignore the July 15, 2013, transaction, and the information that the United States must disclose implicates the CI, the Court may require additional disclosures regarding the CI.

specifies that, if the controlled substance and quantity is "at least 50 G but less than 150 G of Methamphetamine (actual)," then the offense level is 32.  U.S.S.G. § 2D1.1(c)(4).  The USPO calculated the base offense level at 32, based on the 135.1 net grams of methamphetamine (actual) from the May 14, 2013, transactions and the July 15, 2013, transaction.  See PSR ¶ 20, at 5-6.  The USPO did not adjust the base offense level for a mitigating role; it determined, based on Rivas' multiple transactions -- from February, 27, 2013; April 30, 2013; May 14, 2013; and July 15, 2013 -- that Rivas did not play a minor or minimal role, because he "was involved in several transactions over the course of the investigation and he dealt directly with agents."  PSR ¶ 23, at 6.  Because the USPO determined that Rivas did not play a minimal or minor role under § 3B1.2, he was not eligible for the base offense level role reduction under § 2D1.1(a)(5)(i).

Setting aside the July 15, 2013, transaction does not change the calculation under the Drug Quantity Table.  The May 14, 2013, transactions involved 53.2 net grams of methamphetamine (actual), and the July 15, 2013, transaction involved 81.9 net grams of methamphetamine (actual), see PSR ¶¶ 10, 13, at 4; without the July 15, 2013, transaction, the Drug Quantity Table still mandates an offense level of 32, because Rivas sold "at least 50 G but less than 150 G of Methamphetamine (actual)," U.S.S.G. § 2D1.1(c)(4).  Although the Drug Quantity Table calculation would remain the same, focusing only on the May 14, 2013, transactions would lower Rivas' sentencing guidelines calculation, because he would receive a mitigating role adjustment, which would affect his base offense level calculation and give him an additional role adjustment reduction.  Under § 3B1.2, a minimal participant receives a four-level decrease, and a minor participant receives a two-level decrease.  See U.S.S.G. § 3B1.2.  The comments to § 3B1.2 describe these roles:

**(A) Substantially Less Culpable than Average Participant.** -- This section provides a range of adjustments for a defendant who plays a part in committing the offense that makes him substantially less culpable than the average participant.

A defendant who is accountable under 1.3 (Relevant Conduct) only for the conduct in which the defendant personally was involved and who performs a limited function in concerted criminal activity is not precluded from consideration for an adjustment under this guideline.  For example, a defendant who is convicted of a drug trafficking offense, whose role in that offense was limited to transporting or storing drugs and who is accountable under 1.3 only for the quantity of drugs the defendant personally transported or stored is not precluded from consideration for an adjustment under this guideline.

Likewise, a defendant who is accountable under § 1B1.3 for a loss amount under § 2B1.1 (Theft, Property Destruction, and Fraud) that greatly exceeds the defendant's personal gain from a fraud offense and who had limited knowledge of the scope of the scheme is not precluded from consideration for an adjustment under this guideline.  For example, a defendant in a health care fraud scheme, whose role in the scheme was limited to serving as a nominee owner and who received little personal gain relative to the loss amount, is not precluded from consideration for an adjustment under this guideline.

* * * *

**(C)  Fact-Based Determination. --** The determination whether to apply subsection (a) or subsection (b), or an intermediate adjustment, is based on the totality of the circumstances and involves a determination that is heavily dependent upon the facts of the particular case.

U.S.S.G. § 3B1.2 cmt. n.3.  A minimal participant is

a defendant described in Application Note 3(A) who plays a minimal role in concerted activity.  It is intended to cover defendants who are plainly among the least culpable of those involved in the conduct of a group.  Under this provision, the defendant's lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others is indicative of a role as minimal participant.

U.S.S.G. § 3B1.2 cmt. n.4.  A minor participant is "a defendant described in Application Note

3(A) who is less culpable than most other participants, but whose role could not be described as

minimal." U.S.S.G. § 3B1.2 cmt. n.5.  The Court notes that, for the May 14, 2013, transactions, Rivas sold methamphetamine to an undercover officer, but he was not the supplier and had to contact the supplier to obtain the additional methamphetamine and set the price.  The USPO has indicated that, focusing only on the May 14, 2013, transactions, Rivas would have been a minor participant, because, although technically two separate transactions, the circumstances show that they were essentially the same transaction.  The determination that Rivas would receive a minor role adjustment affects Rivas' base offense level calculation, because he would receive the two-level reduction under § 2D1.1(a)(5)(i), resulting in a base offense level of 30, and would also receive a two-level mitigating role reduction under § 3B1.2(b).

Accordingly, if the United States stipulates that the Court should not rely on any transactions other than the May 14, 2013, transactions and declines to produce any more materials for the July 15, 2013, transaction, then the Court will vary downward two levels for the base offense level, resulting in a base offense level of 30, and will vary an additional two levels to reflect the mitigating role adjustment Rivas would have received had the USPO considered only the May 14, 2013, transactions.  The Court will not change the PSR, because it is accurately calculated; but the Court will use its power to vary to make certain it does not rely on the July 15, 2013, transaction. [5]

_____

[5] On April 10, 2014, the United States Sentencing Commission voted to reduce the sentencing guideline levels for drug trafficking sentences.  See Press Release, U.S. Sentencing Commission, U.S. Sentencing Commission Votes to Reduce Drug Trafficking Sentences, at 1 (April 10, 2014), available at http://www.ussc.gov/Legislative_and_Public_Affairs/ Newsroom/Press_Releases/20140410_Press_Release.pdf ("Press Release").  The Commission voted to amend the guidelines to "reduce by two levels the base offense levels for all drug types in the Drug Quantity Table in guideline § 2D1.1."  Press Release at 1.  The Commission will transmit the proposed amendments to Congress by May 1, 2014, and "[i]f Congress does not act to disapprove some or all of the amendments, they will go into effect November 1, 2014."  Press

**IT IS ORDERED** that: (i) the Motion for Discovery, filed November 14, 2013 (Doc. 24), is granted in part and denied in part; and (ii) the Motion for Disclosure of Identity of and Information About Confidential Informant, filed November 14, 2013 (Doc. 25), is denied. Plaintiff United States of America may stipulate that the Court should consider only the transactions for which Defendant Carlos Gonzalez Rivas was indicted when determining a proper sentence; if the United States does not make that stipulation, it must provide discovery related to the drug transaction that took place on July 15, 2013, because that transaction is included as relevant conduct in the Presentence Investigation Report, disclosed February 7, 2014.

_____
UNITED STATES DISTRICT JUDGE

---

Release at 2.  The amendments would affect Rivas' sentencing calculation: the Drug Quantity Table would set his offense level at 30, rather than level 32.  If the United States does not stipulate that the Court should focus exclusively on the May 14, 2013, transactions, and instead opts to disclose additional information regarding the July 15, 2013, transaction, then the Court may vary downward two levels to reflect to proposed amendments to the Drug Quantity Table calculations.  If the United States stipulates that the Court should focus exclusively on the May 14, 2013, transactions, the Court will vary downward two levels to reflect the proposed amendments, because the base offense level would be 30, making Rivas ineligible for the base offense level reduction under § 2D1.1(a)(5) for a mitigating role, because that reduction is available only when the base offense level is 32 or higher.  See U.S.S.G. § 2D1.1(a)(5).  The Court would, however, still vary downward two levels based on the mitigating role adjustment under § 3B1.2(b).

*Counsel*

Steven C. Yarbrough
  Acting United States Attorney
Damon Martinez
Samuel A. Hurtado
Stephen R. Kotz
  Assistant United States Attorneys
United States Attorney's Office
District of New Mexico
Albuquerque, New Mexico

       *Attorneys for the Plaintiffs*

Marc H. Robert
  Assistant Federal Public Defender
Federal Public Defender's Office
Albuquerque, New Mexico

       *Attorneys for the Defendant*